IN THE MATTER OF WILLIAM BLOCK, JOSEPH CASELLA, JAMES GILL, JAMES HIGHBERGER, ROBERT HUGHES, AGNES MORAVEK, KATHY McGREGOR, RAYMOND PETERSON, CHARLES RICHARDS, STEVE VAGRIN, WILLIAM WEINBRENNER, AND WOODBRIDGE TOWNSHIP FEDERATION OF TEACHERS, LOCAL NO. 822, AMERICAN FEDERATION OF TEACHERS, A.F.L.-C.I.O., AN UNINCORPORATED ASSOCIATION, CHARGED WITH CONTEMPT OF COURT.

Argued September 26, 1967—Decided December 18, 1967.

Mr. *Abraham L. Friedman* for appellants (*Mr. Samuel L. Rothbard,* of counsel; *Messrs. Rothbard, Harris and Oxfeld,* attorneys).

Mr. *Francis C. Foley* for respondent.

The opinion of the court was delivered

PER CURIAM. Defendants were convicted in summary proceedings for contempt of court arising out of violations of a restraining order issued to end a strike by school teachers in Woodbridge, New Jersey. The Woodbridge Township Federation of Teachers, Local No. 822, American Federation of Teachers, A.F.L.-C.I.O., was fined $1,000; defendant Casella was fined $1,000 and sentenced to serve six months in jail, the last three months being suspended, subject to probation for two years; defendant Richards was fined $1,000 and sentenced to a term of three months, the last two months being suspended, subject to probation for one year; and the remaining individuals were each fined $500 and sentenced to a term of one month, which jail sentence was suspended, subject to probation for a year. We certified the appeals before argument in the Appellate Division.

In October 1966 the defendant Local No. 822, representing slightly more than half of the 821 teachers of Woodbridge, presented to the Board of Education a list of demands embodied in a document called Project Mews. By letter to the Board dated January 10 signed by its president,

defendant Richards, the Local advised that its Executive Council had adopted the following resolution the day before and had directed its release to all teachers, members of the Board, and news media:

"Whereas, Unless the priority proposals of Project Mews and a revised salary guide of $6,000 to $12,000 be met by the Board of Education; therefore,

Resolved, the Executive Council of the Woodbridge Township Federation of Teachers will recommend that immediate steps be taken to affect a work stoppage in the Woodbridge Township Schools."

On January 15, a meeting of about 400 teachers was held. Defendant Casella, a representative of the national union, who, according to the testimony, is called when help is needed, attended the meeting. Apparently no strike vote was taken, but the members voted to meet at 7:00 A. M. the next day to discuss what to do. The record does not reveal what happened at that meeting on January 16, but some 400 teachers failed to report for work and picket lines were established. The strike being illegal, a restraining order was sought and obtained that day. At a meeting of the teachers that evening, the restraining order was read to the assemblage and copies were served on all defendants except Gill, who was served at 7:00 A. M. the next day. At that meeting Casella and Richards asked the Board to meet to discuss the demands, and when the Board president replied that the Board would meet if the teachers returned to the classrooms, Casella informed the Board and all present that the teachers "were operating from a position of strength" and "they would stay out, out on strike or what have you, until they had a specific agreement with the Board." Casella then announced a meeting would be held at 7:00 A. M. the next morning (January 17) and left, followed by a substantial number of the teachers.

The teachers met at 7:00 A. M. on the 17th with Richards presiding and Casella present. There was no further pick-

eting, but 420 teachers did not report for duty. At about 1:50 P. M. on the 17th Richards wired the Board that "if you desire to reopen the Woodbridge schools, call our office 636-2799." The teachers met again at 7:00 A. M. on the 18th, and more than 400 teachers stayed away from the schools. Later that day the order to show cause issued in these contempt proceedings.

Defendants say the restraining order was too vague to support these charges. The order, though comprehensively phrased to avoid verbal nuances, was plain in its restraints, and surely so with respect to the conduct upon which the convictions rest. None of the defendants could have doubted that the restraining order enjoined what he or she did. We have sketched the role of Richards, including the telegram which stated in effect that the stoppage would continue, despite the restraining order, unless the Board communicated with him. Casella was particularly vocal in his defiance of the restraining order. We noted above his categorical statement that the restraining order would be ignored, made to the assembled teachers on the evening of the 16th after the order was read and served. Earlier that day, upon being told by a member of the press that an injunction was being sought, Casella replied that "We don't know what injunctions are about. They are only an anti-labor tactic. They have never settled the teachers' dispute." Again, when told by a reporter that the court was considering the issuance of the contempt order to show cause, Casella told the reporter that "citations were a bunch of nonsense," that he did not believe anyone would be arrested but "the teachers were prepared to go to Devil's Island and spend the rest of their lives there." These statements were published as Casella obviously knew they would be. As to the other individual defendants, all of whom were either officers or members of the negotiating committee, the testimony showed that all of them stayed away from work on the 16th, the 17th and the 18th notwithstanding service of the restraining order prior to the scheduled time for re-

porting on the 17th, and none of them phoned in to say he or she would be absent or why.

Defendants say the evidence was insufficient to prove guilt beyond a reasonable doubt. We think the recited evidence, none of which was contradicted, is ample, and we agree with the trial court's findings. We find also that the circumstances justify the sentences imposed.

Defendants urge a number of additional challenges, none of which requires extended treatment. It was not error to deny the demand for trial by jury. See *In re Buehrer,* 50 *N. J.* 501, decided this day. Here defendants contend additionally that *N. J. S. A.* 2A:15–56 calls for trial by jury. The statute relates to labor disputes as defined in *N. J. S. A.* 2A:15–58, and a controversy between government and its employees is beyond its scope. See *Delaware River and Bay Authority v. International Organization of Masters, Mates and Pilots,* 45 *N. J.* 138, *pp.* 148–150 (1965).

Defendants, who did not move to vacate the restraining order or to obtain a stay of it, now seek to challenge it on constitutional themes. Passing the issue whether the order may thus be questioned in a contempt proceeding, see *Walker v. Birmingham,* 388 *U. S.* 307, 87 *S. Ct.* 1824, 18 *L. Ed. 2d* 1210 (1967) ; *In re Carton,* 48 *N. J.* 9, 17 (1966), we find no substance in any of the several complaints. There is no issue of involuntary servitude under the Thirteenth Amendment; the individual teachers were free to quit but they could not strike in concert. Nor can defendants claim a right to strike under the State Constitution, *Art.* I, ¶ 19, upon the thesis that they are in private employment because teaching can be pursued under private auspices. We rejected the relevancy here of the distinction between "governmental" and "proprietary" functions in *Delaware River and Bay Authority, supra,* 45 *N. J.,* at 146. When government undertakes itself to meet a need, it necessarily decides the public interest requires the service, and its employees cannot reverse or frustrate that decision by a concerted refusal to meet that need. In any event, teachers are ill-situated to profit from

the distinction we have rejected, since the maintenance of a free public school system is mandated by the State Constitution itself. *Art.* VIII, § 4, ¶ 1. The assertion that a differentiation in this area between a teacher in the public service and a teacher in a private school offends the equal-protection and the due-process clauses of the Fourteenth Amendment seems to us to be plainly frivolous. Nor is the distinction between "office" and "position" or "employment," made in some contexts, relevant to the subject of strikes by public servants.

■■ Finally defendants say the trial court should not have designated the attorney for the Board to serve as prosecutor. Our rules leave this subject to the discretion of the trial court. *R. R.* 4:87–4. In the abstract, it might be ideal to name one who is not counsel for a litigant, but realistically it may be sensible and necessary to call upon an attorney already familiar with the case to present it. See *Whippany Paperboard Co., Inc. v. Local No.* 301, *United Paperworkers of America, C.I.O.,* 11 *N. J.* 153, 166 (1952). Here the attorney did not represent a private client with a dollar interest, but rather a public body. There was no reason to suppose he could not be fair. In fact he was scrupulously so, and defendants say not a word to the contrary. Rather defendants point out that as the trial developed, it became necessary for the prosecutor to testify since he served some of the defendants with the restraining order. The need for that testimony was understandably overlooked when the assignment was made, and no doubt for the reason that no one anticipated defendants would question the fact of service. Defendants did not suggest before trial that the prosecutor might have to testify, nor at the trial did defendants dispute his testimony in the least. They merely insisted, as they could, that the prosecution prove all of the elements of its case. It seems needless to add that defendants do not show they were prejudiced.

The judgments are affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, GOLDMANN, SCHETTINO and HANEMAN—7.

*For reversal*—None.