117 N.J. Super. 255 (1971)
284 A.2d 374
IN THE MATTER OF EDUCATION ASSOCIATION OF PASSAIC, INC., THANE EMERSON BOWEN, AUDREY THALSHEIMER, RACHEL PRATHER, PAULA CLAIRE FUYDAL, IRVING GOLDSTONE, NICHOLAS S. D'AGOSTINO, MANLIO BOVERINI AND WILLIAM J. FLYNN, DEFENDANTS-APPELLANTS, CHARGED WITH CONTEMPT OF COURT.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1971.
Decided December 6, 1971.
*258 Before Judges CONFORD, MATTHEWS and FRITZ.
Mr. Emil Oxfeld argued the cause for appellants (Messrs. Rothbard, Harris & Oxfeld, attorneys).
The opinion of the court was delivered by FRITZ, J.A.D.
Defendants appeal from judgments convicting them of contempt of court for violating an injunctive *259 order enjoining a strike or work stoppage by teachers in the Passaic public school system, or promoting, aiding or abetting the proscribed activity.
Our duty on such appeal, as appellants correctly suggest, is to try the matter de novo on the record below, upon the law and the facts, toward the end of adjudging both guilt and punishment. N.J.S.A. 2A:10-3 and R. 2:10-4; Bd. of Ed. of Newark v. Newark Teachers Union, 114 N.J. Super. 306, 316, 318 (App. Div. 1971); Sarner v. Sarner, 28 N.J. 519, 525 (1959), app. dism. 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028 (1959), reh. den. 360 U.S. 940, 79 S.Ct. 1446, 3 L.Ed.2d 1552 (1959); State v. Gussman, 34 N.J. Super. 408 (App. Div. 1955), and Zimmerman v. Zimmerman, 12 N.J. Super. 61, 69 (App. Div. 1950).
Recognition of our obligation in this regard moots for purposes of this appeal the argument here forwarded that the trial court intruded unreasonably at the hearing to the extent of having "assumed the function of prosecutor." Even were such a charge soundly grounded, defendants would suffer no prejudice, for the "extraordinray review" (Zimmerman, supra, at 69) afforded by our law remains as a bulwark against an attenuation of the rights of an accused.
We are constrained to note, however, that we do not find defendants' argument to be soundly grounded in the record. The trial judge, sitting without a jury, did on occasion extend his questioning of witnesses, but this was, on its major occurrence, in respect to records produced during the testimony of the first witness relating to various meetings, and the inquiry by the court obviously intended no more than a coherent, succinct, chronological recitation of events and an identification of the people involved. Prior to his examination of the witness in this respect the trial judge assured counsel (who had already utilized the first trial day in examining the witness) of his intention to afford them "plenty of chance to ask" questions, but expressed the hope he could save time by his procedure. We *260 believe that relatively early in the trial as it was, this method served the salutary purpose of objectively setting the stage on which the attorneys involved then performed their proper function of strategic advocacy.
Later comments by the court deploring the conduct of defendants and vocalizing the extent to which the sensibilities of the judge were shocked by the fact that
* * * people of this knowledge and ability and position of power over the children of the City of Passaic [referring to defendants] can nevertheless absolutely, unqualifiedly, refuse to follow the law, publish it in the newspaper and tell the whole world, "We simply will not comply with the order of the Court," and then come in and plead not guilty. * * *.
came after the adjudicatory phase of the action, and during the court's findings and conclusions. Defendants, obviously offended by this determination, equate the understandable reaction with an erstwhile and persistent attitude of resentment for "the fact that the defendants had availed themselves of their constitutional right to plead not guilty and ask for a trial," an equation without record support. We believe this comment and others cited by appellant not indicative of permeating prejudice. Cf. In re Buehrer, 50 N.J. 501, 508 (1967).
We find the trial court's inquiries and comments a far cry from the participation castigated in State v. Homer, 86 N.J. Super. 351 (App. Div. 1965), and remain totally unconvinced that such "was so prejudicial as to prove unfairly devastating and detrimental to the rights of the defendant[s]." Id. at 364.
Nor do we labor under any illusion that the absence of a jury of itself insures against the possibility of prejudicial intervention by the judge.
* * * However, the necessity of judicial self-restraint is no less important where the judge sits alone; if he participates to an unreasonable degree in the conduct of the trial, even to the point of assuming the role of an advocate, what he does may be just as *261 prejudicial to a defendant's rights as if the case were tried to a jury. [Band's Refuse Removal, Inc. v. Fair Lawn, 62 N.J. Super. 522, 549 (App. Div. 1960), certif. den. 33 N.J. 387 (1960)].
The sharp and apparent contrast between the proscribed activity in Band's Refuse Removal, Inc. v. Fair Lawn and the conduct of the trial judge here confirms our conviction, upon a review of the whole record, that the latter did not overstep permissible bounds of judicial inquiry or bring to the case any predetermination or innate prejudice.
The principal legal thrust of defendants' appeal challenges the constitutionality of a prohibition against striking by school teachers, asserting at length the oft-repeated argument that the "New Jersey Constitution authorizes public employees to strike and that the distinction between public and private employment in the New Jersey Constitution is not with reference to the right to strike, but with reference to the matters about which organizations of public and private employees may deal with their employers." Their brief acknowledges at the same time that our Supreme Court has consistently held otherwise, and has refused to hold that "teachers are beyond that ban." Bd. of Ed., Union Beach v. N.J.E.A., 53 N.J. 29, 36 (1968); In re Block, 50 N.J. 494, 499-500 (1967). Without respect to the question as to whether the instant order may be thus questioned in a contempt proceeding, In re Block, supra, at 499, we observe that defendants thus answer their own question. Simply put, the issue has been squarely decided adversely to their position by our court of last resort. In such a situation it is not our function to alter the rule. Orlik v. De Almeida, 45 N.J. Super. 403, 409 (App. Div. 1957); Murray v. Michalak, 114 N.J. Super. 417, 420 (1970), aff'd o.b. 58 N.J. 220 (1971).
Defendants seek refuge in an argument that service upon them of the order said to have been violated and for the contempt of which they are charged was effectuated by "two lay persons designated by the plaintiff," and accordingly lacked compliance with R. 4:4-3. The asserted ground *262 is without merit. The rule specifically authorizes service alternatively to that of "the sheriff or other officer authorized by law" in a provision for service "by a person specially appointed by the court for that purpose." Such an appointment was made here when the court, in its order, authorized service by "plaintiff's attorney or agent." Service was effected by plaintiff's agents.
Mention is made of the fact that a later order, extending time for service, referred only to plaintiff and not to a designee. The later order obviously dealt with nothing more than the time limit previously imposed. Nothing in it remotely suggests an intent to vary the prior specific authorization.
All of this is of no moment in any event. Among the earliest of our reported cases appears:
* * * There are cases where the party will be considered in contempt when the injunction was not regularly served, provided they were present in court at the time it was ordered, or had other certain knowledge that the same had been ordered. [Corey v. Voorhies, 2 N.J. Eq. 5, 7 (Ch. 1838)]
This rule has retained its vitality through the years. In In re Buehrer, supra, an inference that defendant had received notice of the injunctive order was held sufficient to permit a conviction upon proofs of defiance of the order 50 N.J. at 506-507.
We are satisfied from our review of the record that all defendants had actual and timely notice of the injunction and at least so much of its contents as it is now claimed they violated. Actual notice or knowledge of a restraint compels compliance, and a defendant will not be saved from sanctions for wilful disobedience by a crafty suggestion that while he knew better, no one handed him the formal documentary embodiment of restraint.
Finally, defendants urge that the record does not support a finding of proof of their guilt beyond a reasonable doubt. We have independently and carefully reviewed the *263 record, as is our duty, and our determination is in accord with that of the trial judge in all respects save one. We are convinced beyond doubt of the actual knowledge of defendants of the restraints imposed, and of the intentional disobedience to that order by all other than the defendant William J. Flynn. We adopt as our own the findings of the trial court, except as they rleate to Flynn, satisfied that they represent a concise and accurate distillation of the facts and reasonable inferences to be drawn therefrom, and ever mindful of the proposition that conviction for this contempt must be predicated on nothing less than proof of guilt beyond a reasonable doubt.
On the other hand, we admit to an uncertainty with regard to violation of the order by defendant Flynn, and it is this dubiety which requires our adjudication of his innocence of the charge of contempt.
William J. Flynn is a field representative employed by the New Jersey Education Association (NJEA) among whose duties were included that of assisting local teachers' organizations affiliated with the state organization, in their contract negotiations with their respective school boards. His area of responsibility covered Sussex, Morris and Passaic Counties and included in the affiliates with which he was charged the Education Association of Passaic (EAP). In this capacity he had for some months been assisting EAP in its conferences with the Passaic Board of Education.
We agree entirely with the findings of the court below that on an occasion prior to the issuance of the restraint in question Flynn had, in a burst of temper, alluded to "games" being played by the board of education and suggested the possibility of a "work stoppage." We concur that there is no affirmative record proof of his having taken positive action to dissuade the teachers from striking after the injunction was known. We share the trial judge's belief that Flynn stayed, at least on some occasions, at the Alexander Hamilton Hotel, at the same time that at least some of the EAP negotiating team teachers were staying there, purportedly *264 to avoid service upon them of the injunction. In this latter respect it is perfectly obvious that whatever other purpose the Alexander Hamilton may have served, it became the convenient caucusing locale for the negotiating committee, a place for liaison between the NJEA and EAP representatives, and a natural habitat for a negotiator such as Flynn, all in connection with negotiations which continued regularly after the issuance of the injunction on January 16, 1970 and until the settlement on February 1, 1970. The pendency of the strike did not lessen the urgent necessity in the public interest to settle the dispute and get the schools functioning again. Negotiations for that purpose between the board of education and the union representatives were going on and were at a critical stage during the days in question. Flynn's presence there was essential to that effort and by reasonable inference is consistent with that purpose as distinguished from the purpose of aiding and abetting the strike.
We do not agree with the trial judge that the findings above converge to support beyond a reasonable doubt a finding that Flynn violated the injunction. The suggestion that a threat of work stoppage made in a moment of zealous ire during negotiations is necessarily proof of authorship of or participation in an illegal strike some time later and after an injunction has issued is, we believe, overdrawn. The equation of lack of affirmative proof of efforts by Flynn to dissuade (and we seriously question whether he had such a legal duty, although we heartily share the trial judge's views that this was his moral duty) with inferences beyond a reasonable doubt of counselling in favor of, or at least aiding and abetting, a strike, is invalid. And were we to condemn on the basis of guilt by association we would be effectively destroying the concept of negotiation. It occurs to us that if the law requires a professional negotiator to disassociate himself entirely from his principals in the event of their illegal activity, we may be denying them and our society help when they need it most.
*265 We pause to state emphatically that such a view is intended in no sense to condone participation in the illegal activity. To the contrary, it is essential that a negotiator so situated diligently avoid participation, even while he endeavors to settle the problems producing the difficulties. His efforts in the latter direction should not be burdened, however, with the probability that he will be tarred with the brush of the guilty merely from association.
We find no direct proof whatsoever of guilt of contempt. The circumstantial proof is equivocal, susceptible of both inculpatory and exculpatory interpretation, and attractive for speculation. Such is not proof beyond a reasonable doubt, and we must acquit William J. Flynn.
Having thus completed our task of adjudging guilt, we turn to punishment. As did the trial judge, we have reviewed the presentence reports. With the exception of that of Thane Bowen, we independently concur in the sentences imposed by the trial judge, generally for the reasons stated, and herewith adopt them as our own.
Accordingly, we impose a fine of $500 upon defendant Education Association of Passaic. Sentences upon the individual defendants are to the Passaic County jail, and are as follows: Audrey Thalsheimer, 45 days; Rachel Prather, 30 days; Paula Fuydal, 30 days; Irving Goldstone, 60 days; Nicholas D'Agostino, 90 days; Manlio Boverini, 75 days.
We take no exception to the sentence imposed upon Bowen and adopt it for ourselves, but we believe execution of the sentence should be suspended and probation imposed. That such is within the authority of the trial court and this court is beyond question. N.J.S.A. 2A:168-1; In re Buehrer, 50 N.J. 501 (1967).
Bowen had been president of EAP and an active negotiator. As soon as the injunction was served and it became apparent that some members of EAP intended to stay away from work in contravention of the terms of the order, Bowen resigned his office. During the week following service of the injunction, negotiations continued and upon two days of that *266 week the teachers struck. Bowen reported for work both days and there is testimony that he encouraged others to emulate his example. His resignation was public, and he assigned as his reason his belief "that the order should be followed and that teachers should accept whatever the Board presented." While this exemplary, if belated, acknowledgment of the fact that the price of our liberty is obedience to law cannot serve completely to excuse a prior contempt, it provides ample justification for mitigation of punishment.
Thane Bowen is sentenced to the Passaic County jail for 30 days. The sentence is suspended and defendant is placed on probation for a period of one year. It shall be a condition of this probation, and the only one, that defendant shall refrain from participation in any illegal activity, including but not limited to striking or work stoppages, in connection with his employment as a school teacher.
An expression of our views in this action would be incomplete without our comment relating to a matter of some concern to us. The complaint supporting the issuance of the order to show cause in which appear the restraints here found to be violated was verified by an affidavit of a high official in the Passaic school system. It now appears from uncontroverted testimony that the affiant was not in fact sworn, does not know the notary public whose name and signature appears on the jurat (although the jurat in usual form recites that the instrument was "sworn and subscribed to before me"), actually signed the instrument in his own office in the presence not of the notary public but of the school board attorney, and did not understand he was signing a sworn statement but, acting under instructions to "Read it over and if you agree with its contents" sign it, signed the affidavit apparently only as a statement of concurrence. As it developed, a paragraph in the complaint when it was first shown the affiant, alleging among other things that picketing or other demonstrations at or near the school premises had been disruptive to the school program, was untrue. The affiant "questioned it at the time" by indicating *267 "to the school board attorney that I had no knowledge of the picketing although there was a rumor that there would be picketing or an honor guard." Testimony from the affiant which was in no way refuted indicates that despite his concern, the language of the complaint was not changed.
Restraint in remonstrance against and castigation of such conduct is difficult. The dangers  to the affiant, the notary, the parties, counsel and the court  that such practices make probable are too manifest to require detailing.
The threat of compromise to the litigation itself is not the least of these. Examples of difficulties engendered by the absence of the officer in the oath taking process are to be found, for instance, in State v. Mershon, 39 N.J. Super. 599 (Cty. Ct. 1956), and Di Giovanni v. Pessel, 104 N.J. Super. 550 (App. Div. 1969), modified 55 N.J. 188 (1970).
No ground for reversal on this basis was here asserted, nor do we think under the particular circumstances of this case such reason for reversal should obtain. But the fortuity implicit in that dictum cannot in any sense justify the indefensible procedure employed by plaintiff Passaic Board of Education and its attorney. Beyond the carelessness of the practice, we find it difficult to say with confidence, as was said in Di Giovanni, supra, that such conduct was "not demonstrative of a wanton and reckless disregard of [defendants'] rights." 55 N.J. at 192
While the cases demonstrate that the result in a given matter may vary according to a true working of justice in that action, we believe the law to be that in order to make an affidavit, there must be present at the same time the officer, the affiant, and the paper, and there must be something done which amounts to the administration of an oath. 39 Am. Jur.2d, Oath and Affirmation § 12, 850.
Only thus can we best insure against the occurrence of the inexcusable thing which happened here: the presentation to the court, on an ex parte application, of a written statement under oath which was factually unsupportable.
Judgment is entered in accordance with the foregoing determinations; any pending stays are vacated.