RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1509-14T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

M.C.-A.,

 Defendant-Appellant.
__________________________________

 Submitted February 7, 2017 – Decided August 8, 2017

 Before Judges Fisher, Ostrer and Leone.

 On appeal from the Superior Court of New
 Jersey, Law Division, Middlesex County,
 Indictment No. 13-08-1143.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Joshua D. Sanders, Assistant
 Deputy Public Defender, of counsel and on the
 brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Sarah E. Ross, Deputy
 Attorney General, of counsel and on the
 brief).

 Appellant filed a pro se supplemental brief.

PER CURIAM
 Defendant, M.C.-A., was convicted of sexually assaulting his

stepdaughter, E.D. (Edith),1 between 2005 and 2012, when she was

ten to sixteen years old. On appeal, he contends the admission

of testimony about the Child Sex Abuse Accommodation Syndrome

(CSAAS) constituted plain error and his sentence was manifestly

excessive. In a pro se brief, defendant also argues his right to

cross-examine Edith was infringed and his conviction was against

the weight of the evidence. We reject these arguments and affirm.

 I.

 Defendant lived with Edith; his wife and Edith's biological

mother, L.D. (Lucy); and his two biological daughters, K.C. (Kelly)

and A.C. (Amy). Edith testified she was five or six years old

when defendant first moved in with Lucy. She was "about nine"

when defendant began sexually abusing her. She testified that

they engaged in countless acts of oral sex before advancing to

sexual intercourse when she was thirteen.

 Many of the assaults occurred in the family residence when

Lucy was out, but Kelly was frequently nearby. Defendant, who was

a truck driver, would also regularly take the two girls to his

truck, which he kept at a nearby parking lot. Once there, he

1
 We use a pseudonym to protect the child's privacy.

 2 A-1509-14T2
would sexually assault Edith while Kelly waited in the car or in

another part of the truck.

 Edith stated that defendant did not demand secrecy; he did

not say "anything . . . about telling." "[H]e would always tell

me, that he loved me as a daughter, and in another way, too." She

testified she "thought of him as a father until I figured what he

was doing to me wasn't right." At one point she asked him to

stop. He responded he would try, but never did. She also once

threatened to tell somebody about what he was doing, and he said

"to go ahead, that he didn't care."

 In January 2012, Edith disclosed the abuse to Lucy, Kelly and

a close friend. She testified she delayed because she was scared.

Lucy immediately called defendant, who was in Texas at the time,

before alerting the authorities. After their conversation,

defendant agreed to drive back to New Jersey. Police stopped him

soon after he crossed the state border.

 During the stop, the investigators conducted a search of

defendant's truck, seizing various electronic devices, including

two cameras. A subsequent forensic search of one unearthed twenty-

two previously deleted images, dated February and August 2010,

depicting a woman, some apparently with her face omitted, in

sexually provocative poses and engaging in sexual acts. Edith

identified herself and defendant's genitalia in the photographs.

 3 A-1509-14T2
She noted she and he were shaven at his request. She also

identified furniture in the background from her mother's bedroom.

 Kelly testified she had seen defendant and Edith engage in

sexual acts through openings in the door of her parents' bedroom.

She also described her trips with Edith to defendant's truck,

noting that Edith would sometimes return from the truck crying and

with "red marks" on her chest. Lucy did not witness any of the

alleged assaults, but she was aware that defendant took Edith to

his truck. She also identified her husband in the recovered

photos. A former co-worker also testified that defendant told him

about the allegations shortly after they were made, and insisted

that what happened between him and his stepdaughter was "mutual."

Edith's friend testified as a fresh complaint witness.

 The State also presented testimony about CSAAS from Susan

Esquilin, Ph.D., who was admitted as an expert in child sexual

assault. The defense did not object to Dr. Esquilin's

qualifications or to the reliability of the social science

supporting her explanation of CSAAS.

 Defendant testified he never had inappropriate sexual contact

with Edith. He also denied he was depicted in the photographs.

He explained that he never used the seized camera; rather, it was

a "family camera" that the children used. He had no idea how it

got into his truck.

 4 A-1509-14T2
 He contended that all the non-police witnesses were liars.

He claimed his wife and daughters were lying to prevent him from

moving the family to North Carolina. He suggested his co-worker

was jealous of his success and insinuated that he may have had a

relationship with his wife. He also described certain behavioral

problems Edith had. Specifically, he noted she had a boyfriend

without telling her mother, and Kelly sometimes lied to cover for

her older sister. The defense also elicited testimony that Edith

skipped school and church as a teen.

 In addition, the defense highlighted the lack of forensic

evidence and inconsistencies between the sisters' recollections.

The defense was critical of the State's failure to investigate

Edith's boyfriend. The defense also invoked Dr. Esquilin's

testimony that abused children commonly disclose assaults in "bits

and pieces," noting that Edith disclosed the attacks "all at one

time."

 The jury convicted defendant of first-degree aggravated

sexual assault for sexually penetrating a victim less than thirteen

years old, N.J.S.A. 2C:14-2(a)(1); first-degree aggravated sexual

assault for sexually penetrating a victim between thirteen and

sixteen years old as "a resource family parent, a guardian, or

[one who] stands in loco parentis within the household," N.J.S.A.

2C:14-2(a)(2)(c); first-degree endangering the welfare of a child

 5 A-1509-14T2
by a parent or a person charged with the child's care or custody,

by causing a child under sixteen years old to engage in a

prohibited sexual act knowing or intending that she be

photographed, N.J.S.A. 2C:24-4(b)(3);2 as well as second-degree

sexual assault, N.J.S.A. 2C:14-2(b); two counts of second-degree

endangering the welfare of a child, N.J.S.A. 2C:24-4(a)

and -4(b)(4); and third-degree aggravated criminal sexual contact,

N.J.S.A. 2C:14-3(a).

 After the verdict, defendant received a psychological

examination administered by Mark Frank, Ph.D. Dr. Frank's report

noted that defendant still "denied any wrongdoing whatsoever."

The report also recorded that defendant had described himself as

"a ladies man," who was "[p]rimarily attracted to younger women,

but clarified he meant women older than age 20." He firmly denied

being a pedophile.

 Dr. Frank concluded that defendant was not eligible for

sentencing under the Sex Offender Act, N.J.S.A. 2C:47-1 to -10,

due to a "clear absence of a finding of compulsive sexual

behavior." He found defendant's actions were "repetitive,"

2
 After the events here, the Legislature modified this section by
making it a first-degree offense without regard to whether the
actor was a parent or in loco parentis, L. 2013, c. 136, § 1, and
raising the age of children protected by the provision, L. 2013,
c. 51, § 13.

 6 A-1509-14T2
intentional acts of "exploitative and hedonistic indulgence[,]"

rather than "irresistible compulsion."

 At sentencing, the trial court found aggravating factors one

— "[t]he nature and circumstances of the offense, and the role of

the actor therein," N.J.S.A. 2C:44-1(a)(1); three — "[t]he risk

that the defendant will commit another offense," N.J.S.A. 2C:44-

1(a)(3); four — "[t]he defendant took advantage of a position of

trust or confidence to commit the offense," N.J.S.A. 2C:44-

1(a)(4); and nine — "[t]he need for deterring the defendant and

others," N.J.S.A. 2C:44-1(a)(9). The court was clearly convinced

that these factors substantially outweighed the sole mitigating

factor, defendant's lack of a prior criminal history, N.J.S.A.

2C:44-1(b)(7).

 The court sentenced defendant to an aggregate thirty-four-

year term of imprisonment. That term comprised consecutive terms

of eighteen years and sixteen years for the two aggravated sexual

assault charges and concurrent terms of twelve years on first-

degree endangering, seven years on second-degree sexual assault,

and six years on one of the second-degree endangering counts. The

remaining counts were merged. The sentence was subject to the No

Early Release Act, N.J.S.A. 2C:43-7.2, and Megan's Law, N.J.S.A.

2C:7-1 to -23.

 7 A-1509-14T2
 II.

 On appeal, defendant raises the following points in his

counselled brief:

 POINT I

 BECAUSE CHILD SEXUAL ABUSE ACCOMMODATION
 SYNDROME OPINION TESTIMONY IS NOT AT A STATE
 OF THE ART SUCH THAT AN EXPERT'S TESTIMONY
 COULD BE SUFFICIENTLY RELIABLE, IT IS
 INADMISSIBLE UNDER N.J.R.E. 702 AND IT WAS
 ERROR TO ADMIT SUCH TESTIMONY IN THIS TRIAL.
 (NOT RAISED BELOW).

 POINT II

 THE CSAAS TESTIMONY WAS IMPERMISSIBLE BOTH IN
 ITS INTRODUCTION AND, SUBSEQUENTLY, SCOPE
 DURING THE COURSE OF THE TRIAL.

 POINT III

 THE SENTENCE IS MANIFESTLY EXCESSIVE BECAUSE,
 AFTER EXPIRATION OF HIS PRISON TERM, DEFENDANT
 WILL BE CLOSELY MONITORED FOR THE REST OF HIS
 LIFE AND WILL BE A LOW RISK TO RE-OFFEND.

 Defendant also raises the following arguments in a pro se

brief:

 Point I:

 Defendant's Sixth Amendment Right to
 Adequately and Fully Cross-Examine the Victim
 was Violated, Especially when there was no
 Authenticated Evidence that the Faceless Male
 Depicted in the Photographs was, in fact, the
 Defendant and Not the Victim's Boyfriend,
 therefore, requiring Reversal of Conviction.

 8 A-1509-14T2
 Point II:

 The State Failed to Meet its Burden of
 Proof Beyond a Reasonable Doubt that the
 Defendant Unlawfully Committed these Crimes as
 Alleged and Charged.

 A.

 Defendant raises two arguments against the use of CSAAS expert

testimony in this case. He broadly challenges our Supreme Court's

long acceptance of CSAAS testimony, and he contends that the use

of CSAAS testimony here exceeded its permitted scope. As he raised

neither argument before the trial court, we apply a plain error

standard of review. Defendant must show that any error must be

"clearly capable of producing an unjust result." R. 2:10-2. Yet,

we discern no error — certainly none "sufficient to raise a

reasonable doubt as to whether the error led the jury to a result

it otherwise might not have reached." State v. Macon, 57 N.J.

325, 336 (1971).

 As to defendant's first argument, we are bound by our Supreme

Court's precedent. See White v. Twp. of N. Bergen, 77 N.J. 538,

549-50 (1978) (stating that trial and intermediate appellate

courts were "bound, under the principle of stare decisis, by

formidable precedent" although the Supreme Court reviewed whether

the precedent "should stand"). Beginning with State v. J.Q., 130

N.J. 554 (1993), and reaffirmed in the years thereafter, see,

 9 A-1509-14T2
e.g., State v. J.R., 227 N.J. 393, 414 (2017); State v. W.B., 205

N.J. 588, 609-11 (2011); and State v. R.B., 183 N.J. 308, 322-28

(2005), the Court has held that there exists a sufficient

scientific basis under N.J.R.E. 702 to admit expert testimony

about CSAAS to "identif[y] or describe[] behavioral traits

commonly found in child-abuse victims." J.Q., supra, 130 N.J. at

573. The Court believed the testimony offered information beyond

the ken of lay persons insofar as it "counter[ed] the mythology

that if the abuse had occurred, the children surely would have

complained sooner." Id. at 582. As the Court stated in R.B.,

supra, 183 N.J. at 329, CSAAS testimony should be used only "to

explain . . . why it is not uncommon for sexually abused children,

without reference to the child victim in that case, to delay

reporting their abuse and why many children, again without

reference to the child victim in that case, recant allegations of

abuse and deny the events at issue."

 The Court has recently decided to reexamine the scientific

basis of CSAAS. See State v. J.L.G., ___ N.J. ___, ___ (2017)

(slip op. at 1-3) (granting certification on the question of "the

reliability of CSAAS testimony" and summarily remanding the matter

to the trial court for a Rule 104 hearing "to determine whether

CSAAS evidence meets the reliability standard of N.J.R.E. 702, in

light of recent scientific evidence"). The Court may also decide

 10 A-1509-14T2
to reexamine the factual premise for concluding that such expert

testimony is needed, that is, the assumption that the average

layperson is unlikely to understand that a victim of child sexual

abuse might delay disclosing the assaults. Cf. Boland v. Dolan,

140 N.J. 174, 188 (1995) (expert testimony is barred unless its

subject matter is "so distinctively related to some science,

profession, business or occupation as to be beyond the ken of the

average layman" (internal quotation marks and citation omitted)).3

However, it is not for this court to reexamine existing precedent.

See In re Educ. Ass'n of Passaic, 117 N.J. Super. 255, 261 (App.

Div. 1971) (stating it is not the intermediate appellate court's

3
 In connection with the underlying "myth" CSAAS was designed to
counteract, the Court relied on the work of Roland C. Summit,
M.D., who observed that "most adults who hear a distraught child
accuse a 'respectable' adult of sexual abuse will fault the child."
J.Q., supra, 130 N.J. at 566-67 (quoting Roland C. Summit, The
Child Sexual Abuse Accommodation Syndrome, 7 Child Abuse and
Neglect 177, 178 (1983)); see also Roland C. Summit, Abuse of
Child Sexual Abuse Accommodation Syndrome, 1 Journal of Child
Sexual Abuse 153, 154 (1992). In recent years, however, the public
has been confronted with the reality of delayed disclosure through
several high-profile incidents. Accordingly, the fact that
children sometimes delay disclosure may no longer be beyond the
ken of the average juror (if it ever was). See Jodi A. Quas et
al., Do Jurors "Know" What Isn't So About Child Witnesses?, 29 Law
and Hum. Behav. 425, 443 (2005) (noting that 84% of participants
in the authors' study "knew that children who are sexually abused
may not tell someone right away"); Ellen Gray, Unequal Justice:
The Prosecution of Child Sexual Abuse 168-69 (1993) (publishing
results of a survey in which most participants believed that
delayed disclosure of child sexual abuse is "quite common").

 11 A-1509-14T2
"function to alter [a] rule" squarely decided by the Supreme

Court), certif. denied, 60 N.J. 198 (1972).

 While defendant's first argument questions precedent

authorizing CSAAS expert testimony, his second argument seeks to

apply it. But we discern no reversible error in Dr. Esquilin's

testimony. She was careful to summarize CSAAS without

"attempt[ing] to connect the dots between the particular child's

behavior and the syndrome, or opine whether the particular child

was abused." W.B., supra, 205 N.J. at 611 (internal quotation

marks and citation omitted). Indeed, she expressly renounced the

use of CSAAS as a diagnostic. She stated, "You can't take the

fact that somebody didn't tell and say they were sexually abused.

You can't conclude from the delay that somebody was abused."

Moreover, the court offered appropriate protective instructions

both after Dr. Esquilin testified and during the final jury charge,

directing the jury not to "consider Dr. Esquilin's testimony as

offering proof that child sexual abuse occurred in this case."

See J.R., supra, 227 N.J. at 413-14.

 We acknowledge that Dr. Esquilin briefly mentioned the

controversy surrounding sexual abuse by priests to describe the

syndrome. This reference was likely inappropriate. See id. at

416 ("To avoid confusing a jury, a CSAAS expert should not cite

another case – particularly a publicized incident that resulted

 12 A-1509-14T2
in a conviction – in his or her testimony."). But "fleeting"

missteps embedded within largely compliant testimony are not

reversible, R.B., supra, 183 N.J. at 326-27, particularly when

there is overwhelming evidence of guilt and the statements are

followed by appropriate limiting instructions, see J.R., supra,

227 N.J. at 417-19.

 Finally, whatever the future may hold for CSAAS expert

testimony, we are convinced Dr. Esquilin's brief summary of the

CSAAS did not affect the outcome of this case in light of the

substantial evidence of guilt and the minor role her testimony

played in the trial. Cf. W.B., supra, 205 N.J. at 614

("Convictions after a fair trial, based on strong evidence proving

guilt beyond a reasonable doubt, should not be reversed because

of a technical or evidentiary error that cannot have truly

prejudiced the defendant or affected the end result."); see also

J.R., supra, 227 N.J. at 417-18. The evidence against defendant

was substantial. The jury heard an extensive account of the abuse

from the victim herself, a second eyewitness account of various

incidents of abuse from the victim's sister, testimony from the

victim's mother and co-worker that corroborated various aspects

of victim's testimony, and pictures — downloaded from a camera in

defendant's truck – of the victim performing oral sex on a person

identified as defendant by the victim and her mother.

 13 A-1509-14T2
 Furthermore, Dr. Esquilin's testimony was brief and avoided

opining about the ultimate issue. To the extent Dr. Esquilin

observed that child sexual abuse victims often delay disclosure,

she may have been telling the jury something it already knew. It

is not even clear that CSAAS provided much explanatory power over

Edith's behavior. Aside from Edith's delay in disclosure, there

were few obvious parallels between the facts in this case and the

"factors . . . involved in delayed disclosure" that Dr. Esquilin

identified and attributed to Dr. Summit. For example, there was

no evidence that defendant expressly demanded secrecy, as Dr.

Esquilin noted was common. And, as defense counsel pointed out

in summation, the way in which Edith disclosed the abuse was

atypical of CSAAS as Dr. Esquilin described it. The State did not

refer to the testimony at all in summation.

 Therefore, we are confident the impact of Dr. Esquilin's

testimony was not prejudicial and not clearly capable of producing

an unjust result.

 B.

 Turning to defendant's sentence, "appellate courts are . . .

not to substitute their judgment for those of our sentencing

courts." State v. Case, 220 N.J. 49, 65 (2014). A sentence will

not be reversed without "such a clear error of judgment that it

 14 A-1509-14T2
shocks the judicial conscience." State v. Roth, 95 N.J. 334, 364

(1984).

 We discern no error in the court's consideration of

defendant's "den[ial of] responsibility for his crimes, despite

the overwhelming evidence against him and the convictions" when

applying aggravating factor three. Doubts have been expressed

about the inference that a failure to confess post-conviction

shows a need for longer imprisonment. See State v. Marks, 201

N.J. Super. 514, 539-40 (App. Div. 1985) (noting its "view that a

defendant's refusal to acknowledge guilt following a conviction

is generally not a germane factor in the sentencing decision"),

certif. denied, 102 N.J. 393 (1986); cf. State v. Poteet, 61 N.J.

493, 497-99 (1972) (stating, in pre-Code case, "when the defendant

has already been convicted, an admission of guilt is of doubtful

value" for rehabilitative purposes, but concluding the trial court

appropriately considered young defendant's admission of guilt and

break with older co-defendant at sentencing). But the inference

has been affirmed in more recent cases. See State v. Carey, 168

N.J. 413, 426-27 (2001) (affirming the trial court's application

of factor three when defendant continued to "den[y] responsibility

for the crash" in a vehicular homicide case); State v. Rice, 425

N.J. Super. 375, 382-83 (App. Div.) (affirming the trial court's

sentence, which considered the fact that the defendant "did not

 15 A-1509-14T2
tell the truth when testifying . . . and took no responsibility

for his actions" when applying factor three (internal quotation

marks omitted)), certif. denied, 212 N.J. 431 (2012); State v.

Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991). And it

certainly does not "shock the conscience" for the trial court to

think that a defendant's utter lack of remorse implies he might

commit the wrong again.

 In any case, this inference was not the sole basis for the

trial court's application of factor three. The court also noted

that defendant only stopped his abuse because he was caught. It

also relied on Dr. Frank's conclusion that the assaults were

repeated, frequent, and rationally-chosen acts of brutality.

These considerations provided ample support for the trial court's

finding that defendant might re-offend.

 We also affirm the court's application of aggravating factor

nine. The Court has explicitly noted that sex abuse "[c]rime

within the family is one of the most deeply troubling aspects of

contemporary life . . . . [that] deeply threatens the fabric of

society." State v. Hodges, 95 N.J. 369, 377 (1984). Accordingly,

"[t]he sentence for such a crime must reflect primarily the

severity of that crime." Ibid.; see also State v. Fuentes, 217

N.J. 57, 79 (2014) (when determining the appropriate sentence,

"[d]emands for deterrence are strengthened in direct proportion

 16 A-1509-14T2
to the gravity and harmfulness of the offense" (internal quotation

marks and citation omitted)).

 The present case concerns the repeated sexual abuse of a

young girl by her stepfather over several years, from childhood

to adolescence. Defendant's actions were not compelled, but were

the result of repeated, intentional decisions to violate and demean

his stepchild. The court's conclusion that there was a heightened

need to deter both defendant and society at large was not an abuse

of discretion.

 C.

 In his pro se brief, defendant challenges the trial court's

decision to preclude defense counsel from asking Edith whether she

had a sexual relationship with her boyfriend. We review the trial

court's decision for an abuse of discretion, see State v. Perry,

225 N.J. 222, 233 (2016), and we discern none.

 Although the right to full cross-examination of an "accusing

witness is among the minimal essentials of a fair trial[,]" a

court may impose "reasonable limits" on defendant's confrontation

rights out of a concern for resulting prejudice. State v. Budis,

125 N.J. 519, 531-32 (1991) (internal quotation marks and citation

omitted). As the Court noted, "evidence of a victim's prior sexual

activity . . . is prejudice per se." State v. Cuni, 159 N.J. 584,

604 (1999) (internal citation omitted). That prejudice provides

 17 A-1509-14T2
sufficient basis to bar evidence unless it "is relevant to the

defense [and] has probative value outweighing its prejudicial

effect." State v. Garron, 177 N.J. 147, 172 (2003), cert. denied,

540 U.S. 1160, 124 S. Ct. 1169, 157 L. Ed. 2d 1204 (2004).

 Here, the sexual nature of Edith's relationship with her

boyfriend was only tangentially relevant to defendant's case.

Specifically, defendant asserts it served two purposes: (1) it

indirectly supported his argument that Edith wanted to stay in New

Jersey and therefore lied about the assaults, and (2) it indirectly

supported the suggestion that Edith's boyfriend took and was

portrayed in the pictures retrieved from the camera seized from

defendant's truck.

 We shall not disturb the court's determination that the

evidence of any sexual relationship between Edith and her boyfriend

was not sufficiently probative of an incentive to fabricate or of

a mistaken identification of defendant's genitalia to warrant

disclosure at trial. Notably, the court permitted defense counsel

both to discuss the intimate nature of Edith's relationship in

other terms and, more importantly, to ask Edith directly whether

her boyfriend took the photos (but defense counsel declined to

pursue that line of questioning). Defendant was therefore not

prejudiced by this limitation on his cross-examination. See State

v. G.S., 278 N.J. Super. 151, 167-72 (App. Div. 1994) (rejecting

 18 A-1509-14T2
the use of assault victim's sexual relationship with her boyfriend

to undermine the victim's credibility where other evidence was

available), rev'd on other grounds, 145 N.J. 460 (1996).

 To the extent not addressed, defendant's remaining arguments

lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

 Affirmed.

 19 A-1509-14T2