86 N.J. Super. 351 (1965)
206 A.2d 905
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HERBERT HOMER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 23, 1964.
Decided January 29, 1965.
*354 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. Joseph L. Freiman, assigned counsel, argued the cause for appellant.
Mr. Gregory J. Castano, Assistant Prosecutor, argued the cause for respondent (Mr. James A. Tumulty, Jr., County Prosecutor of Hudson County, attorney).
The opinion of the court was delivered by LEWIS, J.A.D.
Defendant appeals as an indigent, with assigned counsel, from a judgment of conviction, before a jury, in the Hudson County Court, Law Division. He was sentenced to an indeterminate term not to exceed three years to be served at the New Jersey State Reformatory at Bordentown, and he was fined $500.
The indictment was in one count and charged a violation of N.J.S.A. 40:40-28.7 and N.J.S.A. 40:40-28.8. The former provides:
"A citizen who may become aware of any person who shall have died of criminal violence, or by casualty or suicide, or in any suspicious or unusual manner, shall report such death to the office of one of the coroners of the county or to the police department of the municipality in which such person died or his body was found."
The latter provides that:
"A person who shall willfully neglect or refuse to report such death or, who without an order from the office of the coroner, shall willfully touch, remove or disturb the body of any such person, or touch, remove or disturb the clothing or any article, upon or near such body, shall be guilty of a misdemeanor."
*355 The criminal offenses under consideration involved three men, Allen Lydecker, Edward McCormack and defendant Homer, each of whom was indicted. Lydecker pleaded guilty and testified as a witness for the State. McCormack and Homer were tried jointly and each was found guilty. We are here concerned only with the appeal by Homer who contends, inter alia, (1) the statutory provisions under which defendant was convicted are unconstitutional; (2) the trial court erred in denying defendant's motions for acquittal, (3) the trial judge in his charge failed to limit the effect of his codefendant's confessional statement, and (4) the trial court excessively, and to defendant's prejudice, interjected itself in the trial of the case.
The testimony of the three indictees was variant and conflicting in many significant details.
Lydecker stated that on the morning of July 20, 1962 he was asleep in his apartment at 5110 Palisade Avenue, West New York. Also present were his wife, his two-year-old son, and McCormack, who had slept there overnight. Lydecker was awakened at approximately 10 A.M. by defendant who had entered through the front door, which Lydecker always kept unlocked. Defendant informed him that his brother, Lawrence Homer, whom defendant had brought to the apartment in a state of unconsciousness, had taken an overdose of narcotics and needed help. Lawrence was placed on a couch and attempts were made to revive him by an injection of a salt solution and by "slapping" him. Defendant then left for work, after suggesting that a doctor be called. Soon thereafter Lydecker's wife and child left the apartment. A doctor was never notified. At about 3 P.M. Lydecker observed Lawrence perspiring, and he and McCormack left to find a telephone in what proved to be an unsuccessful effort to contact defendant. They did not return to the apartment until approximately 5:30 P.M., when they met defendant who was returning from work. Upon seeing his brother, defendant exclaimed, "Oh my God, he looks dead," and, after listening to his heart, exclaimed, "He died," and then defendant started to cry. They *356 waited until 9 P.M., and, after rejecting the idea of calling a doctor, decided to take Lawrence to New York. The three men carried him down the one flight of stairs from the apartment, placed him in the rear of "Mr. Homer's" open pickup truck in a prone position and covered him with a blanket. Defendant drove the truck, which was followed by Lydecker and McCormack in a car owned by defendant Homer. They proceeded through the Lincoln Tunnel and finally abandoned the truck and Lawrence at 120th Street and 5th Avenue in New York City.
Lydecker attributed his reluctance to call a doctor to the fact that he had been released on bail in another matter two days earlier and he feared a police investigation of the circumstances of Lawrence's condition. He further stated he was unsure whether he observed that Lawrence perspired or made any sound after 3:30 P.M. on July 20.
McCormack, testifying in his own behalf, stated that he was sleeping in the living room of the Lydecker apartment on July 20 and was awakened by defendant at 10:30 A.M. He noticed that Lawrence appeared to be in "a state of drunkenness" and was breathing, coughing, perspiring and uttering moaning sounds. McCormack, having been intoxicated the previous night, fell asleep again until approximately 3 P.M., at which time he observed Lawrence to be in a more relaxed state  but still perspiring and moaning. He left the apartment with Lydecker and returned later in the afternoon (about 5:30 P.M.) when he heard someone remark, in reference to Lawrence, "Is he dead?" or "He is dead?" McCormack said, however, that Lawrence was then still perspiring and making "grunting" sounds. On deciding to take Lawrence to New York to find help, the witness and Lydecker, around 9 P.M. when it was dark, assisted Lawrence by the arms down the stairs to the truck. Lawrence's feet were not lifted as he was able to move them himself. He was placed in the cab of the truck and was not observed by McCormack when the vehicle and Lawrence were abandoned in New York.
*357 Defendant Homer testified that on the morning of July 20, 1962 he met Lydecker in front of the latter's apartment building. He was informed that his brother Lawrence was in the apartment suffering from an overdose of narcotics. He accompanied Lydecker upstairs and attempted to revive his brother, testifying "Well, we applied ice to the lower part of his back and slapped him around, walked him around a bit." This therapy appeared to partially succeed. Defendant thereupon left for work, returning at about 6 P.M. He found his brother much improved, perspiring and snoring as he peacefully slept. During the next hour, defendant became increasingly more concerned and, at Lydecker's suggestion, he decided to transport his brother to New York in an attempt to find help in an area frequented by narcotics users. At 9 P.M. Lydecker and McCormack helped Lawrence down the one flight of stairs and into the cab of a truck. In doing so they "twisted his foot" to which he reacted by saying "Ouch." In the course of the trip to New York, Lawrence remarked, "I am okay, man. I am just twisted [under the influence of narcotics]." Upon parking the truck at 120th Street and 5th Avenue, defendant and Lydecker placed Lawrence in the rear portion of the open vehicle so as to attract the attention of someone who might render assistance. Before his departure for New Jersey, defendant noted that his brother was still breathing and perspiring.
In addition to Lydecker, the State produced as witnesses two police officers from the New York City Police Department; a detective from the municipal police department of West New York, New Jersey; an officer of the Narcotics Division of the Hudson County Prosecutor's Office; and Dr. Henry Seigel, Deputy Chief of the Office of the Chief Medical Examiner of the City of New York.
The medical evidence was introduced to corroborate the testimony given by Lydecker that decedent actually died on July 20 in New Jersey. Dr. Seigel testified that the body of Lawrence Homer was discovered at the corner of 120th Street and 5th Avenue at 9:20 A.M. of July 21. Lawrence was pronounced *358 dead at Harlem Hospital and the cause of death was attributed to acute chronic intravenous narcotism. The doctor viewed decedent's body at noon on July 21, and an autopsy was performed by him at 1:30 P.M. After explaining the difficulty in such a case of establishing the time of death, he stated that "he [Lawrence] must have been dead at least 12 hours," and his best estimate of the time of death, within a reasonable degree of medical certainty, was more than 12 but less than 18 hours prior to his first view of the body. He was, however, less confident of the maximum than the minimum probable number of hours that Lawrence had been dead.

I.
Defendant claims that the words in N.J.S.A. 40:40-28.8 "shall willfully touch" the body of the deceased, and "touch," referring to "the clothing or any article, upon or near such body," are so vague and indefinite as to fall within the interdiction of due process and render the statute unconstitutional and unenforceable. It is illustratively argued, "If a person drop[s] dead on the street and his hat rolls two feet away from his body, will the touching of that hat subject one to a prison term of three years? * * * Will a doctor who attempts to inject adrenalin into the heart of a person who is dead on an outside chance of reviving him be subject to a prison term under this section?" That argument ignores the fact that the legislation in question is part of the Coroners' Act and is specifically limited to a person who died under stated conditions. Its obvious purpose is to prohibit the willful disturbance of such a corpse or the scene of a death when the circumstances require an official investigation. The law is justifiably concerned with public rights in deceased persons. Note, Jackson, The Law of Cadavers (2d ed. 1950); 15 Am. Jur., Dead Bodies, § 37, p. 857 (1938).
The removal of a dead body from New Jersey to New York under facts such as revealed in the present record would clearly come within the afore-quoted prohibitory legislation *359 and would constitute a direct interference with the administration of our criminal laws.
It is not uncommon to find regulatory penal statutes which are necessarily couched in broad terms because of the particular nature of the subject in question. This court said in State v. New York Central Railroad Co., 37 N.J. Super. 42, 48 (1955):
"That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls, is not a sufficient reason to hold the language too ambiguous to define a penal offense."
That case was cited with approval in State v. Monteleone, 36 N.J. 93, 99 (1961), with the comment, "If a statute is reasonably appropriate in its overall approach, it should be upheld notwithstanding that it may be invalid in its application in special circumstances or fringe areas." See also Sanitary Vendors, Inc. v. Byrne, 40 N.J. 157, 162 (1963), affirming 72 N.J. Super. 276 (Law Div. 1962), in which our Supreme Court said the traditional course of judicial interpretation "strains to give reasonable definiteness to general legislative standards and thereby avoid constitutional challenge," citing authorities.
The language of the statute under consideration is not so vague and uncertain as to make it unconstitutional, particularly in relation to its coverage of the activities of defendant as shown by the evidence herein. It has a legitimate object, and its mandate sufficiently designates the actions proscribed. An ordinary person can reasonably and intelligently conclude what is intended. "Reasonable certainty fulfills the constitutional requirement, and liberal effect is always given to the legislative intent, where possible." Annett v. Salsberg, 135 N.J.L. 122, 126 (Sup. Ct. 1947), affirmed per curiam 136 N.J.L. 194 (E. & A. 1947). See also State v. Russo, 6 N.J. Super. 250, 254 (App. Div. 1950), certification denied 4 N.J. 456 (1950); State v. E.H. Miller Trans. Co., Inc., 74 N.J. Super. 474, 478 (App. Div. 1962), certification denied *360 38 N.J. 306 (1962); 2 Sutherland Statutory Construction (3d ed. Horack, 1943), § 4509, p. 326.

II.
There were direct testimony and circumstantial evidence from which a jury could find beyond a reasonable doubt that Lawrence Homer was already dead on the evening of July 20, 1962 when transported from New Jersey to New York. The State had established a prima facie case. The trial court properly denied defendant's motion for acquittal at the close of the State's case and at the close of the entire case. See State v. Smith, 32 N.J. 501, 521-522 (1960), certiorari denied 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961); R.R. 3:7-6.

III.
Co-defendant McCormack, on July 30, 1962  the day he was apprehended  had given to Detective Warnock of the local police department two written statements. Defendant Homer was not a signatory to these statements or present when they were given. The first one (exhibit S-6), taken at 5:05 P.M., was short and represented general answers to a few specific questions. When it was offered in evidence defendant's counsel objected, to which the court replied, "You are perfectly right. The statements made by a co-defendant cannot be used against the other co-defendant." Then followed a recess, after which Homer's counsel consented to that exhibit's going into evidence with the added comment, "We have no objection whatsoever."
McCormack's subsequent statement (exhibit S-7), timed at 10:15 P.M., was more in detail and narrated the events that happened throughout the day and night of July 20, 1962, and it specifically inculpated defendant Homer. That statement, although only two pages of police recording, mentioned Homer 32 times. Both defendants jointly moved to suppress its admissibility in evidence on the ground that *361 it was made involuntarily. Parenthetically, we note that ordinarily a defendant would not have a legal standing to attack the voluntariness of an incriminatory statement of a codefendant properly confined and received as evidence against the codefendant alone. State v. Ravenell, 43 N.J. 171, 183 (1964). The trial court after argument, out of the presence of the jury, denied the motions saying:
"I will also have the exhibit which is presently identified as S-7 for identification marked as plain Exhibit S-7. This will give the defendant an opportunity now to have the so-called confession presented to the jury where he will have a second chance for the jury to consider whether or not the alleged confession is voluntary or involuntary. And I will give the proper instruction to the jury so that they are aware of their duty in that regard."
The trial resumed before the jurors without any instructions, restricting the use and effect of the McCormack confession, either at the time of its admission or in the court's final charge to the jury. In fact, in the court's charge the jury was told:
`* * * if you find that the State has proven, under the rules I have given to you, that the statement was given voluntarily, then you may consider its contents as evidence in the case, giving to it such weight and credit as you believe it is entitled to."
There was clear error of omission which possessed a genuine capacity to bring about an unjust result in the court's failure to instruct the jury, both at the time the statement was admitted in evidence and upon the final charge to the jury, that McCormack's confession was not to be used as evidence against defendant Homer.
The trial court should have made it unmistakably certain to the jury at the time the McCormack confession was admitted, and also in its charge to the jury, that the out-of-court statement was not admissible or evidential against his codefendant Homer, and that it should be disregarded and not taken into consideration in determining the guilt or innocence of Homer. The decisional authorities are plentiful. See, in *362 particular, State v. Tassiello, 39 N.J. 282, 296-8 (1963); State v. Murray, 33 N.J. 393, 398 (1960); State v. Young, 86 N.J. Super. 262 (App. Div. 1965); State v. Travers, 70 N.J. Super. 32, 42-44 (App. Div. 1961). Note also Delli Paoli v. United States, 352 U.S. 232, 238, 77 S.Ct. 294, 298, 1 L.Ed.2d 278, 283 (1957).
The State urges that any error was waived by counsel's failure to file a written request for instructions to limit the effect of the exhibit, and his failure to register an objection to the charge that was rendered, as provided in R.R. 3:7-7(a), (b). It also urges that the error was harmless, as there was little in the statement that was not testified to in some way by other witnesses. Nevertheless, we regard the omissions by the trial court to have sufficiently seriously affected the substantial rights of the defendant as to constitute plain error within the contemplation of R.R. 1:5-1(a). Moreover, the argument as to the harmlessness of the error must be rejected in view of the decisions in State v. Petrolia, 21 N.J. 453, 460 (1956), and State v. Tassiello, supra, 39 N.J., at p. 296.

IV.
The decedent had died from an overdose of narcotics, and there was some indication in the proofs of possible implication of defendant and Lydecker in the use or traffic of narcotics. Thus the factual circumstances were such that the subject of drug addiction necessarily permeated the trial. Judicial caution was therefore imperative in order to keep within proper bounds the testimonial evidence respecting the potentially prejudicial issues which were extraneous to the specific offenses for which the defendant was being tried.
Under the direct examination of the defendant, the following questions and answers were developed:
"Q. [by Mr. Prizzia, defendant's counsel] Did you have the habit? A. No, sir.
THE COURT: Did you ever take drugs?
THE WITNESS: No, sir.
THE COURT: Never?
*363 THE WITNESS: No, sir. * * *
THE COURT: Mr. Homer, did you ever use a hypodermic needle on yourself for any purpose?
THE WITNESS: No, sir.
THE COURT: Would you mind taking off your coat and rolling up your sleeves?
THE WITNESS: Yes, I would, your Honor.
THE COURT: You would mind?
THE WITNESS: Yes, sir.
THE COURT: All right.
MR. LITTAUER [Assistant Prosecutor]: He would mind?
THE COURT: He would mind.
MR. PRIZZIA: Yes, he would mind, that is his privilege.
MR. LITTAUER: That is not his privilege.
THE COURT: It certainly is.
MR. LITTAUER: Well, all right."
During cross-examination the assistant prosecutor continued the same line of inquiry:
"Q. You say that you never used any narcotic applied to you by injection in your arm?
MR. PRIZZIA: Object. That question has been asked six times.
THE COURT: Not that way. It is cross-examination. Cross-examination I'll permit a certain latitude.
Q. Answer the question. A. No.
Q. You never applied a narcotic  A. No.
Q. (Continuing)  by the use of injection in your arm; is that right?
MR. PRIZZIA: If your Honor please, I object again. It is the second time and it is the identical question.
MR. LITTAUER: That's right. He answered it.
THE COURT: Overruled.
Q. Answer is no; is that right? A. No. That is correct. Emphatically no.
Q. Emphatically No? A. Right.
Q. Would you please remove your coat?
MR. PRIZZIA: If your Honor 
MR. LITTAUER: Wait. I haven't finished yet. Take it easy.
Q. Would you please remove your coat and 
MR. LITTAUER: I'll hold that a minute, your Honor. I have another question.
THE COURT: You are withdrawing 
MR. LITTAUER: I withdraw that question."
Defendant urges that the foregoing examination by the court and the assistant prosecutor constituted reversible *364 error as it violated the general rule that on the trial of a crime charged it is neither competent nor relevant to show that the defendant has committed other crimes unconnected in any way with the one in question.
That rule is subject to several well-established exceptions which are listed in the elucidative opinion of Justice Heher in State v. Kociolek, 23 N.J. 400, 418-419 (1957). One of the several exceptions therein noted relates to the commission of a different offense disclosing a motive for the crime charged. We specifically pointed out in State v. Campisi, 47 N.J. Super. 455, 459 (App. Div. 1957), that proof of a collateral offense is admissible when it has "probative weight in respect of system, intent, knowledge, motive or state of mind." See also State v. Sinnott, 24 N.J. 408, 413 (1957). Here the question of defendant's involvement in drugs was material in that it might show a motive to remove a body of a decedent so as to avert investigation or suspicion of defendant for a narcotics offense if he were found with such a body of one who had died from narcotism. Moreover, defendant having opened the door, in an effort to absolve himself of any imputation of the use of narcotics, invited cross-examination for the purpose of testing the truth of his testimony.
The vital question posed by the foregoing excerpts from the record, however, is whether the manner in which the trial court and the prosecuting attorney pursued their inquiry was so prejudicial as to prove unfairly devastating and detrimental to the rights of the defendant. Cf. State v. Sinnott, supra, 24 N.J., at p. 430.
It is firmly settled in this jurisdiction that a trial judge may, and in some instances should intervene in the trial of a cause. It is a highly important discretionary function of the judiciary. State v. Riley, 28 N.J. 188, 200 (1958). But it is an authority to be used with restraint. Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 132 (1958). As our Supreme Court suggested in State v. Guido, 40 N.J. 191, 208 (1963), "in the usual case it is well to leave the primary burden of examination with counsel and to supplement *365 their efforts, if necessary to clarify the scene, in a way which will lead the jurors to believe the objective is their better understanding." The court there made this significant observation:
"The trial judge is an imposing figure. To the jurors he is a symbol of experience, wisdom, and impartiality. If he so intervenes as to suggest disbelief, the impact upon the jurors may be critical." Ibid.
The intervention by the presiding judge, at the very outset of defense counsel's interrogation of defendant in relation to drug addiction, suggested strong doubt on the part of the court as to the truthfulness of defendant's denial that he was an habitual user of drugs; and this was accentuated by the court's suggestion that the witness remove his coat and roll up his sleeves, in order that his arms might be inspected for evidence of narcotic injections. Even after the trial judge had ruled that defendant need not comply, the prosecuting attorney repeated the objectionable suggestion in the form of a direct request. It is noteworthy that while N.J.S. 2A:84A-19(a) provides that no person has the privilege to refuse to submit to an examination for the purpose of discovering his physical or mental condition, there is no provision that an adverse inference may be drawn from a refusal to so submit. State v. Immerman, 73 N.J. Super. 421, 425 (App. Div. 1962); cf. N.J.S. 2A:84A-17.
Plainly, the tactics employed by the State, against the background of the prior mistaken exercise of discretion by the trial judge, were calculated to implant prejudice in the minds of the jury by re-emphasizing the imputation that defendant was lying. The unwarranted pressing of inquiry into this sensitive collateral area of the case possessed "horrendous capacity for prejudice." Cf. State v. Parsons, 83 N.J. Super. 430, 434 (App. Div. 1964). While the State had every right to attack the credibility of defendant's denial of the use of narcotics, the method here used was unfair as well as prejudicial. It constituted reversible error.
*366 Additionally, appellant claims the trial judge participated in the questioning of the witnesses on direct and cross-examination "at least three hundred times," and that "[t]he very nature of the examination and of the questions virtually cast the Judge in the Prosecutor's role and must have had a prejudicial effect with the jury." The State counters by conceding intervention "a total of some 118 times," but argues that affirmative judicial interposals were "compelled by the petulant wrangling of the defense attorneys and by patent attempts to distort on the part of some witnesses."
This was a protracted and vexatious joint trial. The propriety of the court's participation in the interrogation of the witnesses is not to be judged solely upon the basis of the numerical frequency of the interjections from the bench. It is unnecessary for the purpose of this opinion to analyze the several instances of alleged excessive interferences as the two instances of prejudicial error already mentioned require a retrial of the case. We deem it sufficient, in discussing this last contention, to again refer to the admonition of our Supreme Court in State v. Guido, supra, 40 N.J., at pp. 207-8, and to direct attention to the caveat therein quoted:
"`A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.'" Canon 15, Canons of Judicial Ethics.
Reversed and remanded for a new trial.