228 N.J. Super. 121 (1988)
549 A.2d 55
LOUIS PANTALONE, PLAINTIFF-APPELLANT,
v.
BALLY'S PARK PLACE CASINO HOTEL, DEFENDANT-THIRD PARTY PLAINTIFF-RESPONDENT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF LAW & PUBLIC SAFETY, DIVISION OF GAMING ENFORCEMENT, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Submitted September 13, 1988.
Decided October 6, 1988.
*123 Before Judges LONG and KEEFE.
LaCovara, Sheehan & Gloeser, for appellant (William A. Sheehan, on the brief).
Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, for respondent-third party plaintiff (James D. Toll, on the brief).
W. Cary Edwards, Attorney General of New Jersey, for third-party defendant-respondent (James J. Ciancia, Assistant Attorney General, of counsel; Laurie M. Hodian, Deputy Attorney General, on the brief).
*124 KEEFE, J.A.D., temporarily assigned.
Plaintiff, Louis Pantalone, brought suit against defendant Bally's Park Place Casino Hotel (Bally's) seeking damages stemming from an alleged unlawful arrest and detention which took place on November 13, 1984. After discovery was taken in the matter, Bally's moved for summary judgment claiming immunity under N.J.S.A. 5:12-121(b). The trial judge, concluding that there were no genuine issues of fact, granted summary judgment to Bally's finding that there was probable cause for plaintiff's detention and that the detention was reasonable in all respects. Plaintiff appeals from that decision contending that factual issues exist in the record which preclude such findings without a plenary hearing.
The facts viewed in a light most favorable to the plaintiff follow. In late August or early September 1984, Detective John Wild of the State Police, Division of Gaming Enforcement (DGE) began a review of cases involving credit line frauds that had been initiated by other State Police detectives. Most, if not all, of these frauds occurred at Bally's, one on September 9, 1984. At that time, a man wearing glasses and a moustache requested a credit marker in the amount of $1500.00. He was given the chips, but suspicion arose concerning the authenticity of his signature. The credit marker was transported to the casino credit cage for signature verification. There the signature on the marker was compared with the signature on the original credit application filed by the credit patron. Bally's credit manager, Anthony Cekada, determined that the signature on the marker did not match the signature on the application. Another Bally employee in the credit cage, Bill Pangoras, also determined that the signatures did not match and asked the surveillance department to take a photograph of the suspected forger. Rather than alert their own security forces or DGE of the suspected fraud, Cekada went to the gaming table and asked the suspected forger to sign another marker in a fashion that would match the application. The suspected forger did not accede to Cekada's request. Cekada asked the *125 suspect to return to the credit cage with him. When the suspect could not produce an identification he was simply asked to return the $1500.00, which he did. All of this conduct, which one might conclude was suspicious, was recorded on videotape. However, the suspect was not detained nor was DGE advised as casino regulations apparently require.
After the suspect was permitted to leave, one of the Bally employees decided to advise DGE. Responding to the notification DGE Detective Willshire requested that photographs be made of the suspect from the videotape. He was given 18 photographs of the suspect and was also afforded an opportunity to view the tape. Thereafter, a bulletin was issued by DGE containing a photograph of the suspect and circulated to all casinos, including Bally's.
On November 13, 1984, plaintiff, accompanied by his brother-in-law, visited Bally's. They were unaware that a series of marker forgery incidents had taken place at Bally's in the preceding several months. At some point plaintiff came under the surveillance of one or more of Bally's approximately 180 cameras. The videotape taken of this surveillance will apparently show that plaintiff did not gamble at all. Rather, he is shown watching his brother-in-law gamble. Thus, plaintiff made no attempt to win money nor did he make any attempt to obtain credit from the casino. Defendant does not contend that plaintiff's conduct was suspicious.
Bally's surveillance officer, Michael Neuterman, first observed the plaintiff and concluded that the plaintiff bore some similarity to the photograph on the DGE bulletin. He conferred with surveillance officer Peter LiPuma who came to the same conclusion. Although Neuterman and LiPuma compared the polaroid picture on the DGE bulletin with the video screen, neither that bulletin nor the video tape was viewed by the trial court judge.
Because LiPuma knew that Cekada had dealt directly with the forger on September 9, 1984, it was decided to involve him *126 in the identification process. Lieutenant Pat Smith of Bally's security department approached Cekada at the credit podium and advised him that surveillance had someone that fit the initial description of the forger. Smith then directed Cekada's attention to plaintiff who was standing 30 to 40 feet away from them on the floor near the entrance to the "slot cage." When asked at depositions what he said to Smith, Cekada said: "I said that looks to be  exact, I don't remember exactly what I said to him, but I made the notion that looks like the person." Smith, on the other hand, concluded from his conversation with Cekada that Cekada had made a "positive" identification of the plaintiff. DGE, in turn, was advised that a positive identification had been made and, based upon that advice, DGE officers directed that plaintiff be detained until their arrival.
Detectives Walker, Litino and Wilshire of DGE responded to the call. Detective Walker recalls that upon his arrival, Cekada "advised us the subject that was being detained was positively the suspect involved in forging the markers." However, when he was later asked to make a formal statement to that effect, Cekada flatly refused. Cekada denied at depositions that he made an unequivocal identification of the plaintiff. His testimony on this point is as follows:
Q. Did you, at anytime, to any person, say that you were certain my client was the individual who had attempted forgery on September 9?
A. No.
DGE detectives Litino, Walker and Wilshire noticed dissimilarities between the September 9, 1984 photographs and the photographs taken of the plaintiff on the evening in question before they even saw the plaintiff.
There is no question that plaintiff was detained for 20 minutes prior to the arrival of the DGE officers. His freedom to move was restricted during that period by the Bally security force. It is also clear that plaintiff was not the credit marker forger.
Bally's, however, is not civilly liable to the plaintiff for damages under N.J.S.A. 5:12-121(b) if: 1) probable cause existed, *127 and 2) the detention was in "a reasonable manner for a reasonable length of time." With reference to the issue of probable cause the trial court said the following:
(T)he court feels comfortable in ruling as matter of law that there was a (sic) probable cause for detaining the plaintiff. If you were to read the depositions again it's clear that even the plaintiff acknowledged the striking similarity between he and the felon of 1984. So clearly Bally had probable cause to stop the particular person, call DGE, detain the person in a reasonable manner.
Probable cause in the context of this statute has not been addressed by New Jersey courts. However, courts that have addressed the concept in the context of similar legislation involving shoplifting have applied principles derived from criminal law. Cooke v. J.J. Newberry & Co., 96 N.J. Super. 9 (App.Div. 1967); Henry v. Shopper's World, 200 N.J. Super. 14 (App.Div. 1985). The decision as to whether probable cause exists in a given case is essentially for the trial judge. In making that decision the judge "strikes a balance between the interests of an individual in being free from police interference and the interests of society in effective law enforcement." State v. Dilley, 49 N.J. 460, 468 (1967). The individual's interest originates in the Fourth Amendment right to be free from "unreasonable" searches and seizures. The balance is a delicate one to be performed by the judicial officer who may not abrogate that responsibility to a third person. Our Supreme Court has stated that probable cause "is something less than proof needed to convict and something more than a raw, unsupported suspicion. It is a suspicion (or belief) of guilt that is `well grounded.' (citations omitted) The emphasis is upon a practical, realistic view of law enforcement, in recognition of the primacy of the individual's right to be safe from attack." State v. Davis, 50 N.J. 16, 23-24 (1967).
In order to determine the reasonableness of defendant's decision to detain plaintiff, the court must weigh all the pertinent factors in the case. These include the severity or lack of severity of the offense, the factual basis for the suspicion upon which the defendant acted, and the nature and extent of the restraint on plaintiff's freedom of movement. The judgment *128 cannot simply rest upon a finding that the defendant acted in good faith. The justification for defendant's conduct must be grounded on facts within the knowledge of the person responsible for the arrest, which facts in the judgment of the court make defendant's conduct objectively reasonable. The question is not whether the person responsible for the arrest thought the facts to constitute probable cause, but whether the court thinks that such facts constitute probable cause. Director General of Railroads v. Kastenbaum, 263 U.S. 25, 44 S.Ct. 52, 68 L.Ed. 146 (1923).
Lastly, probable cause for detention must exist at the time the detention took place. Nothing that occurs thereafter is relevant. State v. Contursi, 44 N.J. 422 (1965); State v. Hutchins, 43 N.J. 85 (1964). Thus, plaintiff's statement in depositions concerning the similarity between his photograph and that of the suspect is irrelevant to the determination. Moreover, it is not clear that the plaintiff was shown the same photographs that defendant relied upon to effect the detention.
Because the trial judge did not articulate the reasons for the decision finding probable cause beyond that which has been quoted above, it is unclear that he applied the appropriate standards. Plaintiff was not acting suspiciously. Thus, it would appear that the sole justification for his detention was defendant's comparison of the videotape with a polaroid snapshot along with the apparently equivocal identification made by Cekada. By not requiring the defendant, at the very least, to produce the videotape and the polaroid snapshot against which it was compared, the trial judge abrogated the decision as to the existence of probable cause to the defendant rather than making an independent assessment himself. Without that evidence before him no determination of probable cause could have been made.
The plaintiff also argues on appeal that the trial court erred in concluding as a matter of law that Bally's acted in a reasonable manner for a reasonable length of time once the *129 detention was effected. We disagree. The design of the statute is to prevent a private individual such as Bally's from exercising unreasonable or unnecessary force and to turn the suspect over to the DGE as soon as practicable. The evidence is clear that there was no unreasonable or unnecessary force used against plaintiff and that the 20 minute detention period prior to the arrival of the DGE officers is reasonable under the circumstances. Cooke v. J.J. Newberry & Co., supra.; Henry v. Shopper's World, supra.
We reverse and remand the matter to the trial judge for proceedings to review the actual evidence relied upon by defendant in detaining plaintiff and for detailed fact findings as to the issue of probable cause.