289 N.J. Super. 199 (1996)
673 A.2d 309
ANGELA LIPTAK, ALLISON MARIE LIPTAK, AN INFANT THE AGE OF 14 BY HER GUARDIAN AD LITEM, JOSEPH LIPTAK, AND JOSEPH LIPTAK, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
RITE AID, INC. A/K/A NO. 1736 T/A RITE AID PHARMACY AND ALEX MELLO, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 20, 1996.
Decided April 2, 1996.
*206 Before Judges PETRELLA, P.G. LEVY, and EICHEN.
Issac Henkoff argued the cause for appellants (Chapman, Henkoff, Kessler, Peduto & Saffer, attorneys; Mr. Henkoff, of counsel and on the brief; Diane Bongiovanni, also on the brief).
Grace J. Velardo argued the cause for respondents (Velardo, Koprowski & Delgado, attorneys; Ms. Velardo, of counsel and on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiffs Angela Liptak, her daughter, Allison Marie Liptak, *207 and her husband, Joseph Liptak,[1] appeal from a jury verdict of no cause of action against them on their complaint against Rite Aid, Inc. and Alex Mello for false imprisonment. Their motion for a new trial was denied.
On their way to go food shopping, Liptak and her young daughter stopped to purchase panty hose at a local pharmacy owned and operated by Rite Aid. Liptak selected seven packages from a panty hose display, two of which exhibited coupons entitling the customer to a discount of thirty-five cents at the register. Liptak, a "consistent" coupon user, asked a store employee whether Rite Aid would honor the coupons. When the employee responded affirmatively, Liptak took a place at the end of a long line and began preparing her purchases for check-out by removing the coupons and putting them in her basket, which she had placed on the front counter.
During her search for additional coupons, Liptak noticed that some of the packages had been opened, and she became concerned that the contents differed from the description on the labels. Liptak checked that the garments matched the labels and placed the packages back in her basket along with a forty-cent coupon that she had found inside one of the packages. Recalling other items that she needed to purchase, Liptak left the check-out line and proceeded to an end aisle.
Liptak stated that her "coupon caddy," an expandable folder in which she filed her coupons, had not left her hand, and that her purse had not left her shoulder as she removed three Band-Aid coupons and two toothpaste coupons from the caddy. She compared them with the products that she had selected while in the aisle and placed the coupons in her basket. At this time, Liptak contended, Rite Aid Store Manager Mello called to her as he approached from the front of the store with a uniformed Clifton police officer. Mello told Liptak that he had witnessed her *208 stealing coupons from panty hose packages and repeatedly asked her to come to his office despite her denials of theft. Mello allegedly grabbed Liptak's shoulder, but was rebuffed in his effort to push her toward his office. Liptak asserted that she went to the office only after Mello threatened to have the officer handcuff her. Liptak indicated on cross-examination that she had spent five to eight minutes speaking with Mello and about ten minutes in the aisle before going to his small office near the store entrance.
At Mello's office, Liptak maintained her entitlement to "save 35 cents today" as the coupons attached to the panty hose packages stated. Mello retorted that she should have purchased the items and used the coupons that she had taken from the packages with a later purchase.[2] He wanted "to book her" because he considered her to be as guilty as "teenage girls that come into this store and steal makeup." Mello unsuccessfully attempted to telephone his superiors. He confirmed with the officer that Rite Aid had one year to prefer charges against Liptak for theft of the three coupons. Neither Liptak's purse nor her person was searched despite her consent to permit it. Although Liptak was then allowed to leave, she took ten more minutes to purchase the items in her basket, using in the process the three coupons that Rite Aid had accused her of stealing.[3] She left the store at about 5:00 p.m., went home, and was upset for the rest of the day.
Liptak testified that she grew more fearful the following day upon realizing that Rite Aid could have her arrested at any time during the ensuing one-year period. She asserted that this affected her work performance and created friction with her husband because "I just kept badgering him with this incident...." She *209 became reclusive, as well as obsessed and paranoid, refusing to go shopping without her husband. The incident allegedly caused her to experience depression, hair loss, and facial lesions within two weeks of the incident. Her doctor prescribed a tranquilizer for the depression and ointment for the lesions. Her daughter apparently rebounded from her own depression, but Liptak suffered nightmares that prompted her to seek counseling from a psychiatrist and from Clifton Mental Health Services (Clinic). There was conflicting medical testimony concerning her condition and its cause.
The judge ruled on Rite Aid's motion at the end of plaintiffs' case that Liptak had established a prima facie case of unlawful detention. He commented, however, that she also could have been charged with shoplifting if she had left the store without purchasing the item after removing a coupon from within one of the panty hose packages because he considered coupons to be "goods within the term merchandise" under the merchant defense to the shoplifting law. The judge rejected Rite Aid's application for a ruling that, as a matter of law, it had probable cause to stop and detain Liptak and that its detention of Liptak was reasonable. Notwithstanding Liptak's argument that Mello's reliance on "police presence," his threat "to cuff her," and his instigation of a police report evidenced malice toward her, the judge granted Rite Aid's motion to dismiss her punitive damages claim for lack of proof of malicious or wanton conduct.
Over plaintiffs' objection following a Rule 104 hearing, the judge admitted into evidence as a business record a Clinic "Diagnostic Intake Evaluation" form completed by Liptak's therapist, Arlene Bondy. See N.J.R.E. 803(c)(6). The form indicated that Liptak had told Bondy that her husband was an alcoholic and unsupportive of her during her incident. Bondy had written that Liptak was using the incident "to bring out [her] marital problem of alcohol." Rite Aid proffered the Clinic record to rebut Liptak's claim that the incident had caused her psychological problems. Because Bondy had since moved to Arizona, her supervisor, Pamela Noblin, *210 authenticated the record by identifying her own and Bondy's signatures on Liptak's diagnostic intake evaluation form. Finding the records to be reliable based upon Noblin's testimony, the judge admitted them into evidence. In rebuttal, Liptak asserted that Bondy had made the marital problem comment to her and denied referring to her husband as an alcoholic.
Mello testified for the defense that he had watched Liptak twice look into an open panty hose package, remove an item, place it in her purse, and return the package to the panty hose display. Mello stated that he had asked a police officer who was shopping in the store if he would observe Liptak, at which time they approached her in a non-threatening manner without touching her. Mello twice requested that Liptak come to his office. When he inquired what she had taken, Liptak produced three coupons. In response, Mello said they were store property until purchased.
Mello asserted that the coupons had a face redemption value to the customer and a store credit value if they went unused. Mello claimed that Liptak did not indicate her intention to use the coupons with her purchase, although he did not look to see whether they were "same-day" coupons. At the officer's request, Mello attempted unsuccessfully to contact his supervisor. Mello denied threatening Liptak with arrest or abusing her.
At the end of the case, Rite Aid moved for a directed verdict on the probable cause and reasonable duration issues. The judge concluded from Liptak's testimony, which he assumed to be true for purposes of the motion, that Mello might have perceived that she had removed a coupon and placed it in her basket without intending to purchase the package from which it had come. Liptak's attorney questioned how Mello could have formed such a reasonable belief if the jury rejected his testimony that he had seen Liptak place the coupon in her purse rather than in her basket. The judge nevertheless ruled that, as a matter of law, Rite Aid had probable cause to detain Liptak, and that it did so for a reasonable period of time. His decision left the jury to decide only whether Rite Aid had detained Liptak in a reasonable *211 manner. The judge instructed the jury on the reasonableness issue by stating:
If you find that the plaintiff was intentionally restrained or confined and that the defendant took the plaintiff into custody in an unreasonable manner then you should conclude that the detention was unlawful and you should find that there was false imprisonment. If you believe that the plaintiff, and I have found as a matter of law, willfully concealed unpurchased merchandise and that the defendant could attempt to recover that merchandise by ... taking the plaintiff into custody and that the defendant took the plaintiff into custody for this purpose and detained the plaintiff in a ... reasonable manner then you should find that the detention was lawful. .. . [emphasis supplied].
The jury returned a unanimous verdict of no cause of action against plaintiffs.

I.
Our standard of review of the dismissal of the punitive damages claim, see R. 4:37-2(b), and the rulings on the probable cause and reasonable time issues, see R. 4:40-1, is "whether `the evidence, together with the legitimate inferences therefrom, could sustain a judgment in ... favor' of the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969) (quoting R. 4:37-2); see also Brill v. The Guardian Life Ins. Co. of America, 142 N.J. 520, 536, 666 A.2d 146 (1995). Accordingly,
[i]f accepting as true all the evidence which supports the position of the party defending against the motion and according [her] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. [Dolson, supra (55 N.J. at 5, 258 A.2d 706) (citations omitted)].
A merchant's detention of a customer in a false imprisonment action is subject to N.J.S.A. 2C:20-11, "the Shoplifting Act" (Act). Cooke v. J.J. Newberry & Co., 96 N.J. Super. 9, 12, 232 A.2d 425 (App.Div. 1967). The Act grants an affirmative defense to liability for false imprisonment by providing that
a merchant, who has probable cause for believing that a person has willfully concealed unpurchased merchandise and that he can recover the merchandise by taking the person into custody, may, for the purpose of attempting to effect recovery thereof, take the person into custody and detain him in a reasonable manner for not more than a reasonable time, and the taking into custody ... shall *212 not render such person criminally or civilly liable in any manner or to any extent whatsoever. [N.J.S.A. 2C:20-11e].
"Because of the seriousness of the shoplifting problem, this court has concluded that [the Act] must be construed in a manner reasonably calculated to carry out its objective of protecting the merchant from shoplifting and safeguarding the innocent customer." Henry v. Shopper's World, 200 N.J. Super. 14, 17, 490 A.2d 320 (App.Div. 1985).
While it is undisputed that Liptak removed a coupon from the inside of one package of panty hose and from the outside of two other packages, the parties disagree as to whether those coupons qualify as "merchandise" under the Act. The determination of that question resolves the issue of whether Rite Aid is entitled to assert the affirmative defense in N.J.S.A. 2C:20-11e. N.J.S.A. 2C:20-11a(3) defines "merchandise" as "any goods, chattels, foodstuffs or wares of any type and description, regardless of the value thereof...." The judge concluded that coupons are goods within the statutory definition of "merchandise" by analogizing a coupon to a piece of candy or a toy in a cereal box. He reasoned that the Act protects merchants from the loss of value of products containing coupons that would result if consumers could remove them without purchasing the products.
Although this particular classification issue appears to be one of first impression in New Jersey, we have drawn upon prior discussions of the nature of coupons in rendering our decision. The Chancery Division identified the difference between trading stamps and "premiums or rebates in the form of coupons" in Supermarkets Gen. Corp. v. Sills, 93 N.J. Super. 326, 349, 225 A.2d 728 (Ch.Div. 1966). Sills noted that a statute discriminating against the use of rebates and premiums by pharmacists "apparently was distinguishing between a form of cash discount [stamps] and what otherwise would comprise premiums or inducements to buy [coupons]." If a coupon is recognized as a "price-cutting device," State by Richman v. The Sperry and Hutchinson Co., 56 N.J. Super. 589, 603, 153 A.2d 691 (App.Div.), aff'd o.b., 31 N.J. 385, 157 A.2d 505 (1960), then it follows that it may possess some *213 inherent value if used with the purchase of merchandise and before any expiration date.[4]
In fact, the Tax Court has differentiated between two types of coupons that reduce prices. See Burger King Corp. v. Taxation Div. Dir., 9 N.J. Tax 251, 255 n. 2 (Tax Ct. 1987), aff'd o.b., 224 N.J. Super. 628, 541 A.2d 241 (App.Div. 1988). The Tax Court explained that a manufacturer's coupon (of the type Liptak removed from inside the panty hose package) "entitl[es] a purchaser to purchase at a price less than as advertised," in exchange for which "[t]he manufacturer reimburses the retailer-seller for the face amount of the coupon." Ibid. We agreed with the Tax Court that the State could not levy a sales tax on revenues generated by Burger King's "two for the price of one" coupons inasmuch as they did not have a market value in money because they were not reimbursable. Burger King, supra, 224 N.J. Super. at 630, 541 A.2d 241, aff'g, 9 N.J. Tax at 255, 258. Our opinion observed that "[w]e were not concerned ... with a coupon entitling a purchaser to buy at a reduced rate, where the manufacturer or a third party ultimately reimburses the retailer-seller." Ibid.
Despite the fact that Burger King did not decide whether manufacturer's coupons possess independent market value, we are mindful that "[t]he common denominator [of the Act] is preventing the loss of merchandise without full payment  the protection of inventory." De Angelis v. Jamesway Dept. Store, 205 N.J. Super. 519, 526, 501 A.2d 561 (App.Div. 1985). The trial judge here felt that removal of manufacturer's coupons from their packages without legal sanction would impair the value of those goods because those coupons are regarded as having value, a criterion of "merchandise" to which N.J.S.A. 2C:20-11a(3) expressly refers.
*214 In light of the remedial and pragmatic interpretation given to the Act, see Henry, supra, 200 N.J. Super. at 17-18, 490 A.2d 320, an interpretation of the statutory language of goods or chattels "of any type and description, regardless of the value thereof" that excludes coupons would "impermissibly limit the protection afforded by the statute," id. at 18, 490 A.2d 320. Accordingly, the trial judge did not err in finding that coupons function as an important component of goods so as to qualify as "merchandise" within the meaning of N.J.S.A. 2C:20-11a(3).

II.
The issue of probable cause has been described as "`something less than proof needed to convict and something more than a raw, unsupported suspicion'"; in essence, "`[i]t is a suspicion (or belief) of guilt that is well grounded.'" Pantalone v. Bally's Park Place, 228 N.J. Super. 121, 127, 549 A.2d 55 (App.Div. 1988) (quoting State v. Davis, 50 N.J. 16, 23-24, 231 A.2d 793 (1967)). In Pantalone, judgment had been granted to a casino in a false imprisonment case under the Casino Control Act, see N.J.S.A. 5:12-121(b). The casino had detained a customer based upon a comparison of a videotape that showed his resemblance to a photograph of a wanted forger. Id. at 124-127, 549 A.2d 55. We held that the trial judge should have performed his own independent assessment by compelling the production of the evidence upon which the casino justified its detention. Id. at 128, 549 A.2d 55. Rite Aid thus argues that Pantalone established that the decision as to whether probable cause exists is one for the trial judge alone to make.
In Horn v. Village Supermarkets, Inc., 260 N.J. Super. 165, 615 A.2d 663 (App.Div. 1992), a jury awarded damages to an alleged shoplifter for malicious prosecution, but rejected his false arrest and false imprisonment claims. A supermarket security officer testified that he had observed the plaintiff place vitamins into his jacket pockets and proceed to the check-out line. When the officer made eye-contact with him, the suspect left the line and *215 removed the vitamins from his person shortly before security detained him. The plaintiff insisted that he had not concealed any merchandise, but had only returned to a store aisle because he had forgotten to purchase something.
The Court surmised from the verdict that the jury had acquitted the supermarket of the false arrest and imprisonment charges because it had probable cause to believe that the plaintiff had attempted to "`willfully conceal unpurchased merchandise'" that the supermarket was attempting to recover by detaining him. Id. at 171, 615 A.2d 663 (quoting N.J.S.A. 2C:20-11e). Contrary to Rite Aid's position, Horn indicates that the issue of probable cause is for the jury where the facts are in dispute. See Prostick v. Vroom, 128 N.J.L. 383, 386, 26 A.2d 268 (Sup.Ct. 1942), aff'd, 129 N.J.L. 465, 467, 29 A.2d 857 (E. & A. 1943) (Probable cause is question of law when facts are undisputed). Cf. Jorgensen v. Pennsylvania Railroad Co., 38 N.J. Super. 317, 349, 118 A.2d 854 (App.Div. 1955), certif. denied, 20 N.J. 308, 119 A.2d 791 (1956) (defense prejudiced on probable cause determination where there was a factual dispute and jury was instructed that truth of charge was irrelevant to determination).
Liptak and Mello gave contradictory versions of the June 25, 1988 incident. The trial judge concluded that probable cause existed under either version and decided the issue as a matter of law. In fact, if the jury had accepted Mello's version as true, then he had probable cause under N.J.S.A. 2C:20-11e because there were grounds upon which a reasonable belief that Liptak had been shoplifting would have existed.[5]
If the jury believed Liptak's version, however, it does not follow, as the trial judge concluded, that Henry v. Shopper's World, supra, 200 N.J. Super. at 19, 490 A.2d 320, supports a finding in *216 this case of probable cause as a matter of law. In Henry, a department store security guard had noticed a customer attempting to leave the store while "wearing a coat with a tag fastened to its back." The guard detained the customer, who maintained that she had purchased the coat at the store the previous day. The tag did not verify the purchase because it only listed factual information about the jacket. We disagreed that the store lacked probable cause to detain her and rejected the plaintiff's argument that she had not hidden the coat within the meaning of N.J.S.A. 2C:20-11e. We explained that the remedial purpose of the Act would best be served by reading the language "as applying to items in plain view but worn or carried as though they had been purchased," as well as to "merchandise which is hidden or out of sight." Id. at 18-19, 490 A.2d 320.
Henry is somewhat analogous to the instant appeal in that Liptak admitted removing a coupon from the inside of a panty hose package and placing the coupon and the merchandise in her basket, thereby ostensibly exhibiting the coupons as hers while in plain view. Nevertheless, unlike Henry, there is a factual dispute between what Liptak claimed that she did and what Mello contended that he saw her do. If the jury had believed Liptak, then there would have been no factual basis for probable cause to believe that she had been shoplifting. Mello had not testified, however, that he had observed Liptak act in the manner to which she had admitted. Cf. Cooke, supra, 96 N.J. Super. at 14, 232 A.2d 425, (implying that if anyone has seen shoplifting occur, then merchant has probable cause even if merchant did not see act). Because Rite Aid bears the burden of proving probable cause, an objective view of Liptak's actions could have afforded probable cause to detain her only if Mello had asserted that he had observed actions which would have supported a reasonable belief that shoplifting had occurred. Cf. Carollo v. Supermarkets General Corp., 251 N.J. Super. 264, 267-268, 597 A.2d 1105 (App.Div. 1991) (supermarket security officer had reason to believe that suspect was shoplifting, and thus had probable cause to detain *217 him, based upon her observation of suspect transferring pack of cigarettes from shopping cart to his jacket pocket). Accepting Liptak's version as true, we find that the trial judge erred in deciding probable cause as a matter of law. It was for the jury to resolve the factual dispute underlying the probable cause issue.

III.
Liptak also argues on this appeal that the trial judge erred in holding that Rite Aid detained her for a reasonable period of time as a matter of law. We disagree.
In Cooke, supra, 96 N.J. Super. at 12-14, 232 A.2d 425, a customer detained by a department store for allegedly shoplifting a pair of stretch pants appealed from a directed verdict dismissing her false imprisonment action on the ground that the jury should have decided whether she had been detained for "more than a reasonable time." We concluded that the Act approved a detention for the recovery of goods and the summoning of the police. Id. at 14-15, 232 A.2d 425. Under the circumstances of that case, we held (one judge dissented) that the twenty-seven minute interval between her detention and the arrival of police was not unreasonable as a matter of law. Ibid. Cf. Henry, supra, 200 N.J. Super. at 18-19, 490 A.2d 320, (thirty to forty-five minutes held not unreasonable detention period). Likewise, even relying on Liptak's testimony, Rite Aid's detention of her in order to discuss, report, and evaluate the incident was not for an unreasonable period of time. The trial judge did not err in so holding.

IV.
Similarly, we find no error in the dismissal of Liptak's punitive damages claim. Punitive damages serve the "`admonitory function'" of "expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice." Fischer v. Johns-Manville Corp., 103 N.J. 643, 657, 512 A.2d 466 (1986). Punitive damages do not apply to a situation *218 where a person has a legal right to do what was done and did so legally. O'Connor v. Harms, 111 N.J. Super. 22, 30, 266 A.2d 605 (App.Div.), certif. denied, 57 N.J. 137, 270 A.2d 40 (1970). Punitive damages are available in a false imprisonment case where the circumstances indicate "`an intentional and deliberate act imbued with the character of outrage.'" De Angelis, supra, 205 N.J. Super. at 527, 501 A.2d 561.
Liptak complained that Mello had engaged in malicious conduct toward her, including: accusing her of theft; grabbing her shoulder and threatening her with arrest in order to bring her to his office; using a loud voice; threatening to "book her"; and, clarifying with the police officer in her presence that Rite Aid had one year to prosecute her. Assuming these facts to be true, the trial judge correctly concluded that they did not support a prima facie case of egregious conduct so as to allow recovery of punitive damages. Cf. id. at 524-527, 501 A.2d 561.

V.
Liptak additionally contends that the judge erred in admitting into evidence the three-page patient intake evaluation form that therapist Bondy had completed during her first therapy session with Liptak at the Clinic. Liptak asserts that the form was both vague hearsay and prejudicial to her case because it informed the jury of Bondy's conclusion that Liptak was using the Rite Aid incident to deal with a marital problem of her husband's alleged alcoholism. The crux of Liptak's contention is that the records lacked reliability because Bondy was not qualified at trial as an expert and her diagnosis concerned a complex medical condition. Rite Aid simply responds that the record at issue satisfied the traditional standards established for the admissibility of business records.[6]
*219 The purpose of the business records exception is to "broaden the area of admissibility of relevant evidence where there is necessity and sufficient guarantee of trustworthiness." State v. Hudes, 128 N.J. Super. 589, 599, 321 A.2d 275 (Cty.Ct. 1974). The rationale for the exception is "founded upon the theory `that records which are properly shown to have been kept as required normally possess a circumstantial probability of trustworthiness, and therefore ought to be received in evidence.'" State v. Matulewicz, 101 N.J. 27, 30, 499 A.2d 1363 (1985) (quoting Mahoney v. Minsky, 39 N.J. 208, 218, 188 A.2d 161 (1963)).
Feldman v. Lederle Labs, 132 N.J. 339, 354, 625 A.2d 1066 (1993), has identified three "requisites for admissibility" under the exception:
First, the writing must be made in the regular course of business. Second, it must be prepared within a short time of the act, condition or event being described. Finally, the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence.
Contrary to Liptak's position, although an element of the common law exception, "[t]he requirement of unavailability of the recorder has been eliminated" from the modern exception. Hudes, supra, 128 N.J. Super. at 600, 321 A.2d 275. Nevertheless, the "general acceptance of reliability" accorded to business records "will not attach if `the trial court, after examining them ... and hearing the manner of their preparation explained, entertains serious doubt as to whether they are dependable or worthy of confidence.'" Matulewicz, supra, 101 N.J. at 30, 499 A.2d 1363 (quoting Mahoney, supra, 39 N.J. at 218, 188 A.2d 161); see N.J.R.E. 808 (authorizing admissibility of hearsay statement containing expert opinion in absence of expert for cross-examination where circumstances "tend to establish its trustworthiness"). The determination of admissibility rests within the discretion of the trial judge, but the *220 final decision as to trustworthiness or credibility is for the jury. Mahoney, supra, 39 N.J. at 218-219, 188 A.2d 161.
During the admissibility hearing, see N.J.R.E. 104(a), former Clinic[7] supervisor Noblin testified that the patient intake evaluation form routinely served as the predicate for treatment by providing staff members with a "standardized record" of patient history. The therapists supervised by Noblin completed this form contemporaneously with client meetings, after which she reviewed it for accuracy. Noblin buttressed the reliability of the completed form as a business record by testifying that it shared the characteristics of a hospital record in that Clinic therapists and doctors often relied upon the information contained therein for diagnostic treatment. Cf. Webber v. McCormick, 63 N.J. Super. 409, 164 A.2d 813 (App.Div. 1960) (admitting hospital record into evidence based upon testimony of hospital records custodian whose position afforded her sufficient knowledge of hospital recordkeeping to vouchsafe its reliability).
In Falcone v. N.J. Bell Tel. Co., 98 N.J. Super. 138, 146, 236 A.2d 394 (App.Div. 1967), certif. denied, 51 N.J. 190, 238 A.2d 475 (1968), we considered the admissibility of a patient record that contained the diagnosis made by the patient's deceased physician. Although concurring with the admission of the record into evidence under the exception, we found that the trial judge had abused his discretion in excising the diagnosis from the record. See id. at 147-150, 236 A.2d 394. The doctor's diagnosis was analogized to laboratory and X-ray reports as "the opinion of a scientific expert ... who has examined the patient, heard his statement and observed his symptoms." Id. at 148, 236 A.2d 394.
*221 While Webber supports the reliability of Liptak's patient intake evaluation form as a source of mental health treatment on the basis of Noblin's testimony, Falcone militates against the admissibility of Bondy's comment. The trial judge did not consider Bondy's qualifications, and he erred in admitting the record by not determining whether she was an expert in her field before accepting her opinion as a trustworthy segment of the Clinic record. See Nowacki v. Community Med. Center, 279 N.J. Super. 276, 281-282, 652 A.2d 758 (App.Div. 1995).
Furthermore, in State v. Martorelli, supra, 136 N.J. Super. at 454, 346 A.2d 618, we noted "that not all diagnostic findings are admissible." Although "routine observations, findings and conclusions clearly are admissible," an "expert opinion contained in business records may be excluded if it relates to diagnoses of complex medical conditions difficult to determine or substantiate." Gunter v. Fischer Scientific Amer., 193 N.J. Super. 688, 694, 475 A.2d 671 (App.Div. 1984) (citing Martorelli, supra, 136 N.J. Super. at 453-454, 346 A.2d 618). The Supreme Court has acknowledged that "[g]iven the complexity of the many diagnostic procedures involved, expert medical testimony is required to establish the fact of ... alcoholism." Clowes v. Terminix Intern., Inc., 109 N.J. 575, 597, 538 A.2d 794 (1988).
The approach taken in Nowacki controls the applicability of N.J.R.E. 803(c)(6), as qualified by N.J.R.E. 808, to the Clinic form in the present appeal. In Nowacki, we held that, absent the opportunity to cross-examine, medical records should not be admitted where they concern "a critical issue such as the basis for the diagnosis or cause of the condition in question." 279 N.J. Super. at 282-283, 652 A.2d 758. Bondy, a non-testifying "expert," concluded here that Mr. Liptak was an alcoholic, and that Liptak "[was] using [the Rite Aid] incident to bring out [her] marital problem of alcohol[ism]." The diagnosis of alcoholism, a complex medical condition, comprises the basis of Bondy's conclusion that Liptak was relying on the Rite Aid incident to deal with marital problems caused by her husband's alleged condition. That finding *222 was, therefore, a complex diagnosis concerning the psychological impact of cohabitating with an individual afflicted with alcoholism. Liptak was deprived, however, of the opportunity through cross-examination of testing the accuracy of Bondy's determination that Liptak's concern about her husband's alleged alcoholism had caused her emotional problems. The failure to afford Liptak her right to confront Bondy was critical to her cause because Bondy's conclusion directly contradicted Liptak's contention that Mello's actions had resulted in those difficulties. Accordingly, we find that the trial judge mistakenly exercised his discretion in admitting the Clinic records into evidence under the business records exception to the hearsay rule. See N.J.R.E. 808 (citing as factors dispositive of evaluation of trustworthiness of expert opinion contained in hearsay statement "the complexity of the subject matter" and "the likelihood of accuracy of the opinion").
In addition, given the aforementioned erroneous admission, it was a mistaken exercise of discretion under N.J.R.E. 403 for the trial judge to admit this potentially prejudicial evidence. See State v. Loftin, 287 N.J. Super. 76, 96-97, 670 A.2d 557 (App.Div. 1996). "The question ... is not merely whether the treating [therapist's opinion] will be prejudicial to the plaintiff[], but whether it will be unfairly so." Stigliano by Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 317 (1995). The Bondy opinion might have persuaded the jury as to the alternative cause of Liptak's injuries based upon a complex diagnosis the reliability of which was never established at trial. See N.J.R.E. 808. Under these circumstances, the trial judge's decision to admit the Clinic record was "so wide of the mark that a manifest denial of justice resulted." Loftin, supra, 287 N.J. Super. at 97, 670 A.2d 557 (quoting State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982)).

VI.
We are also satisfied that plaintiff's new trial motion should have been granted. A motion for a new trial after a jury verdict should only be granted if "it clearly appears that there was *223 a miscarriage of justice under the law." R. 2:10-1; see Dolson, supra, 55 N.J. at 7, 258 A.2d 706.
A new trial is warranted
[w]here a charge has [had] a natural tendency to interfere with the exercise of the jurors' unbiased judgment by reason of strong overemphasis of the court's opinion on the evidence, [because] the inference of false direction and undue influence is entirely reasonable, if not, ... irresistible. [Morie v. New Jersey Manuf. Indem. Ins. Co., 48 N.J. Super. 70, 83, 137 A.2d 41 (App.Div. 1957)].
The trial judge advised the jury that he had considered Liptak guilty of shoplifting. This had the likely effect of misleading the jury in its deliberation on the only issue submitted to it: the reasonableness of the duration of Liptak's detention. The judge charged the jury that "in your deliberations you are required to accept and be controlled by the law as stated and explained by the court."
The judge informed the jury that he had decided the issues of probable cause and reasonable duration in Rite Aid's favor as a matter of law, and that its sole "function will be to determine whether or not the manner in which the defendant was detained [was] reasonable...." In analyzing the issue of reasonable manner, however, the judge also instructed the jury that he had found that Liptak had "willfully concealed unpurchased merchandise".
Through this charge, the judge usurped the jury's function by essentially telling the jurors to decide whether Rite Aid had acted reasonably in detaining an individual whom the judge regarded as a shoplifter as a matter of law. Under this state of affairs, it is likely that the jury viewed Rite Aid's actions as an inherently reasonable effort to recover merchandise from a shoplifter. See Fitzmaurice v. Van Vlaanderen Mach. Co., 110 N.J. Super. 159, 165, 264 A.2d 740 (App.Div. 1971) ("We must assume that the jury was guided by the court's instructions."). The prejudicial impact of the conclusory statement was confirmed by the judge's prior instruction that he had already determined that Rite Aid had probable cause to detain Liptak in the first place. The effect of the trial judge's characterization of Liptak as a criminal sufficiently *224 establishes a probability of a miscarriage of justice given that impact, thus warranting reversal of the denial of Liptak's motion for a new trial. See R. 2:10-1.

VII.
Notwithstanding our determination that reversal is required, we reject Liptak's argument that the trial judge harbored an apparent subconscious prejudice toward her claim such as to support a finding of cumulative error. See Feldman, supra, 132 N.J. at 352, 625 A.2d 1066 (citing Borowicz v. Hood, 87 N.J. Super. 418, 424, 209 A.2d 655 (App.Div.), certif. denied, 45 N.J. 298, 212 A.2d 170 (1965)). The record reflects that the judge conscientiously attempted to deal with complex legal issues and often resolved them on the merits in favor of Rite Aid. Our review of the record satisfies us that the judge did not comment or act during the trial in a manner "`so prejudicial as to prove unfairly devastating and detrimental to the rights of the [plaintiffs].'" In re Education Ass'n of Passaic, Inc., 117 N.J. Super. 255, 260, 284 A.2d 374 (App.Div. 1971) (quoting State v. Homer, 86 N.J. Super. 351, 364, 206 A.2d 905 (App.Div. 1965)). Plaintiffs' argument in this regard is meritless. See R. 2:11-3(e)(1)(E).
Reversed and remanded for a new trial in accordance with this opinion.
NOTES
[1] Joseph Liptak asserted a per quod claim. For convenience in this opinion, reference to Liptak in the singular refers only to Angela Liptak.
[2] The record does not reflect whether either the package or the coupon found therein indicated that they could be used only in connection with a subsequent purchase, as contrasted with the coupons attached to the outside of the packages for use at the time of purchase.
[3] The record on appeal does not contain the coupons at issue in this case or a facsimile.
[4] Compare Webster's Ninth New Collegiate Dictionary 299 (1988) (defining of "coupon" as "a certificate or similar evidence of a purchase redeemable in premiums") with id. at 1250 (defining "trading stamp" as "a printed stamp of value given as a premium to a retail customer to be redeemed in merchandise when accumulated in numbers") (emphasis supplied).
[5] See N.J.S.A. 2C:20-11b(4) (defining shoplifting as purposeful transfer of merchandise offered for sale "from the container in or on which the same shall be displayed to any other container with intent to deprive the merchant of all or some part of the retail value thereof").
[6] Rite Aid offered the record solely as substantive evidence (i.e., to prove the truth of the contents thereof). It urges here that the records were admissible because its expert medical witness testified that he relied upon them in making his diagnosis. See Blanks v. Murphy, 268 N.J. Super. 152, 162-164, 632 A.2d 1264 (App.Div. 1993). Blanks is inapposite because Bondy's opinion regarding Liptak's condition as it related to Mr. Liptak's alleged alcoholism was clearly not "a straightforward observation of a treating physician...." Id. at 164, 632 A.2d 1264.
[7] The Clinic qualifies under the exception given the broad definition of the term "business." See N.J.R.E. 801(d) ("`business' includes every kind of business, institution, association, profession, occupation and calling, whether or not conducted for profit...."). Cf. State v. Martorelli, 136 N.J. Super. 449, 453, 346 A.2d 618 (App.Div. 1975), certif. denied, 69 N.J. 445, 354 A.2d 642 (1976) (Bergen Pines Hospital qualified as "business" under exception).